608 So.2d 4 (1992)
Paul Beasley JOHNSON, Appellant,
v.
STATE of Florida, Appellee.
No. 72694.
Supreme Court of Florida.
October 1, 1992.
Rehearing Denied December 14, 1992.
*6 James Marion Moorman, Public Defender and Douglas S. Connor, Asst. Public Defender, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen. and Candance M. Sunderland, Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
Paul Johnson appeals his convictions of first-degree murder and sentences of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm Johnson's convictions and sentences.
In 1981 a jury convicted Johnson of three counts of first-degree murder, two counts of robbery, kidnapping, arson, and two counts of attempted first-degree murder. The trial court sentenced him to death, among other things, and this Court affirmed the convictions and sentences. Johnson v. State, 438 So.2d 774 (Fla. 1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1329, 79 L.Ed.2d 724 (1984). After the signing of a death warrant, Johnson petitioned this Court for writ of habeas corpus, claiming ineffective assistance of appellate counsel for not challenging the trial court's allowing his jury to separate after it began deliberating his guilt or innocence. We acknowledged that not keeping a capital-case jury together during deliberations is reversible error and granted Johnson a new trial. Johnson v. Wainwright, 498 So.2d 938 (Fla. 1986), cert. denied, 481 U.S. 1016, 107 S.Ct. 1894, 95 L.Ed.2d 500 (1987). Johnson's retrial began in Polk County in October 1987. During the trial, however, the judge granted Johnson's motion for mistrial based on juror misconduct. After that, the judge granted Johnson's motions to disqualify him and to change venue of the case. The case then proceeded to trial in Alachua County in April 1988 with a retired judge assigned to hear it.
The following evidence was presented at the new trial. The evening of January 8, 1981 Johnson and his wife visited their friends Shayne and Ricky Carter. During the evening they all took injections of crystal methedrine and smoked marijuana. Johnson left the Carters' home later in the evening, and Ricky testified that Johnson said he was going to get more drugs and that he might steal something or rob something. Shayne testified that Johnson said that he was going to get money for more drugs and that "if he had to shoot someone, he would have to shoot someone."
A taxicab company dispatcher testified that driver William Evans went to pick up a fare at 11:15 p.m. on January 8 and called in to confirm the fare fifteen minutes later. Around 11:55 p.m. a stranger's voice came over the radio. Among other things, the stranger said that Evans had been knocked out. He stayed in touch with the dispatcher off and on until about 2:00 a.m. The dispatcher did not hear Evans after 11:30 p.m., and workers in an orange grove found Evans' body on January 14. Evans had been robbed and shot twice in the face. Searchers found his taxicab, which had been set on fire, in an orange grove about a mile from Evans' body.
When she got off work in the early hours of January 9, 1981, Amy Reid and her friend Ray Beasley went to a restaurant for breakfast. Johnson approached them in the parking lot and asked for a ride, claiming that his car had broken down. Beasley agreed to drive Johnson to a *7 friend's house. During the drive, Johnson asked Beasley to stop the car so that he could urinate. While out of the car, Johnson asked Beasley to come to the rear of the car. When Reid looked back, she saw Johnson holding a handgun pointed at Beasley. She then locked the car's doors, moved to the driver's seat, and drove away to look for help.
Reid telephoned the sheriff's department from a convenience store, and deputies Clifford Darrington and Samuel Allison responded to her call around 3:45 a.m. The deputies drove Reid back to where she had left Johnson and Beasley, but found no one there. Back in the patrol car they heard a radio call from another deputy, Theron Burnham, advising that he had seen a possible suspect on the road. When they arrived at Burnham's location, they found his patrol car parked with the motor running, the lights on, and a door open, but could not see Burnham. Johnson, however, walked in front of their car, spoke to them, and then began firing at them with a handgun. The deputies returned Johnson's shots, and he ran across a field and disappeared among some trees. Allison then found Burnham's body in a roadside drainage ditch. He had been shot three times, and his service revolver was missing.
Later that day, Beasley's body was found seven-tenths of a mile from where Burnham was killed. He had been shot once in the head, and his body was in a weedy area and could not be seen from the road. Although there were some coins in his pockets, his wallet was gone.
The following afternoon Johnson's wife was still at the Carters' home. They saw a police sketch of the suspect in the night's events in a newspaper and discussed whether it looked like Johnson. Johnson telephoned the Carters' home, and, after speaking with him, his wife became very upset. Ricky Carter asked Johnson if he had done the killings reported in the newspaper, and Johnson replied: "If that's what it says." Carter went to pick up Johnson, taking a shirt that Johnson changed into. Johnson threw the shirt he had been wearing, which had been described in the newspaper, out the car's window. While driving home, Carter heard Johnson's wife ask, "You killed him, too?" to which Johnson replied, "I guess so." At the Carters' home Johnson told them that he hit the deputy with his handgun when told to place his hands on the patrol car and then struggled with him, during and after which he shot the deputy three times.
The authorities arrested Johnson for the Beasley and Burnham murders on January 10 and charged him with Evans' murder the following week. Reid, Allison, and Darrington identified him, and his fingerprints were found in Evans' taxicab.
While Johnson was in jail awaiting trial, inmate James Leon Smith was in a cell near him. At trial Smith testified that Johnson told him that he killed a taxicab driver and set the taxicab on fire to destroy his fingerprints, that he shot Beasley while Beasley was on his knees and stole one hundred dollars from Beasley, and that he shot the deputy.
Johnson's defense was that, at the time of these killings, he was insane because of his drug use. To this end he presented numerous witnesses, including a pharmacologist, who testified about the effects of amphetamines on the human nervous system, and several acquaintances, who testified about his drug use. Thomas McClane, a psychiatrist, examined Johnson in 1987 and testified that, at the time of these crimes, Johnson was so intoxicated by drugs that he was suffering from an amphetamine psychosis which rendered him temporarily insane. Another psychiatrist, Walter Afield, examined Johnson in both 1981 and 1987 and opined that Johnson suffered from a toxic psychosis that made him insane. On cross-examination, however, Afield acknowledged that he relied only on Johnson's statements regarding his drug use and that someone can be psychotic but still know right from wrong and still know what he or she is doing.
Two psychiatrists testified in rebuttal for the prosecution. In Gary Ainsworth's opinion Johnson was not insane when he committed these crimes. Johnson had been committed to a psychiatric unit because of *8 drug abuse in 1980, and Ainsworth testified that Johnson was not as intoxicated when he committed the instant crimes as he was during the 1980 episode. Robert Coffer's opinion was similar, and he found significant differences between the 1980 incident and these crimes. He testified that, although intoxicated, Johnson did not have a toxic psychosis and was sane while committing these crimes on January 8 and 9, 1981.
After hearing all of the evidence, the jury rejected Johnson's insanity defense and found him guilty as charged of three counts of first-degree murder, two counts of armed robbery, kidnapping, arson, and two counts of attempted first-degree murder.
In the penalty phase Johnson presented testimony from his aunt and two uncles and from three of the psychiatrists who testified during the guilt phase. The jury recommended that he be sentenced to death for each of the murders. The trial court agreed with that recommendation and imposed three death sentences.
As his first point on appeal, Johnson claims that the trial court erred in granting the State's challenge for cause of two particular prospective jurors. Early in voir dire of the first group of prospective jurors, the prosecutor asked the following question: "Now, understanding that that may be one of the issues in this case, is there anyone here today who has a fixed and settled opinion against the death penalty? If so, raise your hand." Four prospective jurors did so, and the prosecutor questioned them further. Their answers established that these four people could not fairly consider Johnson's guilt knowing that death was a possible penalty. The prosecutor then asked:
In a case where a defendant has been found guilty of first degree murder, is your feeling about the death penalty such, having had a chance to think about it for a moment now, all of you, is your feeling about the death penalty such that you could not, under any circumstances that you can think of, vote to impose a sentence of death on a defendant? If that's the case, raise your hand.
(Emphasis added.) In addition to the four people who answered the first question affirmatively, prospective jurors Daniels and Blakely raised their hands in response to this second question. The prosecutor asked no further questions as to the death penalty of the six prospective jurors, including Blakely and Daniels, that responded to the second above-quoted question. Although defense counsel questioned the entire panel about numerous other subjects, he never asked Blakely and Daniels of their feelings about the death penalty and never tried to rehabilitate them.
As the United States Supreme Court has stated: "Unless a venireman is `irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings,' he cannot be excluded." Davis v. Georgia, 429 U.S. 122, 123, 97 S.Ct. 399, 400, 50 L.Ed.2d 339 (1976) (quoting Witherspoon v. Illinois, 391 U.S. 510, 522 n. 21, 88 S.Ct. 1770, 1777 n. 21, 20 L.Ed.2d 776 (1968)). A prospective juror's inability to be impartial about the death penalty, however, need not be made "unmistakably clear." Wainwright v. Witt, 469 U.S. 412, 425, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). It is the trial judge's duty to decide if a challenge for cause is proper, id. at 423, 105 S.Ct. at 851, and "deference must be paid" to the judge's determination of a prospective juror's qualifications. Id. at 426, 105 S.Ct. at 853.
In the instant case neither Blakely nor Daniels indicated in any way that they could follow the law. The record does not show that they could set aside their beliefs, and Johnson has shown no abuse of discretion in the trial judge's granting the motion to excuse them for cause. See Gunsby v. State, 574 So.2d 1085 (Fla.), cert. denied, ___ U.S. ___, 112 S.Ct. 136, 116 L.Ed.2d 103 (1991); Mitchell v. State, 527 So.2d 179 (Fla.), cert. denied, 488 U.S. 960, 109 S.Ct. 404, 102 L.Ed.2d 392 (1988). Thus, there is no merit to this point on appeal.
*9 We also find no merit to Johnson's other arguments regarding voir dire. The trial judge has great discretion in deciding if prospective jurors must be questioned individually about publicity the case may have received. See Mu'Min v. Virginia, ___ U.S. ___, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991). Johnson has demonstrated no abuse of discretion in his trial judge's refusal to allow individual questioning of the prospective jurors.
A trial court has wide latitude in regulating proceedings before it. Medina v. State, 573 So.2d 293 (Fla. 1990). Contrary to Johnson's claim that the judge's repeated interruptions and rebukes of counsel during voir dire prejudiced him, the record shows that the judge treated both sides in an evenhanded manner and only insisted that his directions be followed. Johnson has demonstrated no abuse of discretion. Cf. Paramore v. State, 229 So.2d 855 (Fla. 1969), vacated on other grounds, 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 751 (1972); Baisden v. State, 203 So.2d 194 (Fla. 4th DCA 1967).
Johnson also argues that the trial court erred in denying his motion to suppress the testimony of James Leon Smith. Johnson filed the suppression motion in his original trial, the trial court denied it, and this Court affirmed that denial. Johnson, 438 So.2d at 776. In 1987 the trial court agreed to rehear the motion to suppress. Following the 1987 evidentiary hearing, the court held that no new or credible evidence sufficient to support the motion had been produced.
As this Court has stated previously: "The ruling of the trial court on a motion to suppress comes to us clothed with a presumption of correctness and we must interpret the evidence and reasonable inference and deductions in a manner most favorable to sustaining the trial court's ruling." Owen v. State, 560 So.2d 207, 211 (Fla.), cert. denied, ___ U.S. ___, 111 S.Ct. 152, 112 L.Ed.2d 118 (1990). The facts of this case, i.e., Johnson confessing to Smith, Smith approaching the authorities, and Smith continuing to talk with Johnson solely on his own initiative, do not show a violation of Maine v. Moulton, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), or United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). Johnson has not overcome the presumption of correctness as to the trial court's ruling, and we find no merit to this claim. Accord Maquiera v. State, 588 So.2d 221 (Fla. 1991); DuBoise v. State, 520 So.2d 260 (Fla. 1988); Muehleman v. State, 503 So.2d 310 (Fla.), cert. denied, 484 U.S. 882, 108 S.Ct. 39, 98 L.Ed.2d 170 (1987); DuFour v. State, 495 So.2d 154 (Fla. 1986), cert. denied, 479 U.S. 1101, 107 S.Ct. 1332, 94 L.Ed.2d 183 (1987).
On redirect examination the prosecutor asked Smith if Johnson had talked about what his defense might be. Smith responded that Johnson "said he could play like he was crazy, and they would send him to the crazyhouse for a few years and that would be it." The prosecutor used this statement in arguing to the jury. Johnson now claims that the court erred in overruling his objection to letting Smith make this entire answer and that the prosecutor's argument constituted reversible error. Johnson, however, did not object to the prosecutor's argument and, therefore, that part of this claim has not been preserved for appeal. Steinhorst v. State, 412 So.2d 332 (Fla. 1982). Even if he had objected, we would not reverse because the trial court did not err in allowing Smith's complete answer to the question.
On cross-examination defense counsel asked Smith about Johnson's telling Smith of his drug use and his blaming drugs for his loss of control. Johnson concedes that the first part of Smith's answer, "he could play like he was crazy," has some bearing on Johnson's insanity defense. The prosecutor claimed that the "rule of completeness" permitted Smith's complete answer on redirect with regard to the defense of insanity. The trial court ruled that the defense opened the door to Smith's relating Johnson's statement to him.
The rule of completeness is codified as section 90.108, Florida Statutes (1987), and applies to writings and recorded statements. "Although the language of section *10 90.108 does not cover testimony regarding part of a conversation, a similar consideration of the potential for unfairness may require the admission of the remainder of a conversation to the extent necessary to remove any potential for prejudice that may result from the original evidence being taken out of context." Charles W. Ehrhardt, Florida Evidence § 108.1 at 32 (1992). Moreover, "testimony is admissible on redirect which tends to qualify, explain, or limit cross-examination testimony." Tompkins v. State, 502 So.2d 415, 419 (Fla. 1986), cert. denied, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 781 (1987). We find no abuse of discretion in the trial court's finding Smith's answer admissible to rebut an inference created by questioning on cross-examination. Tompkins; Hinton v. State, 347 So.2d 1079 (Fla. 3d DCA), cert. denied, 354 So.2d 981 (Fla. 1977).
The defense called Smith's former probation officer in an attempt to impeach Smith's testimony and now argues that the trial court improperly limited this witness' testimony. We do not address the merits of this issue because if there was error it was clearly harmless. The jury was well aware that Smith was seeking favors from the state for his testimony.
Johnson also tried to call a former public defender's investigator to testify to Johnson's appearance and demeanor after arrest to show that he had been under the influence of drugs. The prosecutor objected, claiming that he could not cross-examine the witness effectively unless he had access to the notes the investigator took while interviewing Johnson. Johnson refused to waive his attorney-client privilege as to those notes and now argues that sustaining the prosecutor's objection erroneously excluded corroboration of his defense of insanity. A defendant, however, cannot use the attorney-client privilege selectively to elicit favorable testimony and to block unfavorable testimony. Delap v. State, 440 So.2d 1242 (Fla. 1983), cert. denied, 467 U.S. 1264, 104 S.Ct. 3559, 82 L.Ed.2d 860 (1984). We see no difference between Johnson's verbal and nonverbal communication with the investigator and hold that the trial court did not err in refusing to admit his testimony when Johnson refused to waive the privilege.
We also find no merit to Johnson's claim that the trial court should have instructed the jury to disregard any past wrongful acts Johnson might have committed. The defense introduced Johnson's prior drug use to support its insanity defense. The prosecutor did not use it to show Johnson's bad character or propensity to commit crimes, and Johnson suffered no undue prejudice.
Therefore, we find no reversible error in the guilt phase of Johnson's trial. His convictions are supported by competent, substantial evidence, and we affirm them.
Johnson raises several claims regarding his death sentences. He made a video tape expressing remorse for these killings and asked that it be shown to the jury. The trial court, however, agreed with the prosecutor that Johnson should not be allowed to escape cross-examination by not testifying in person. We agree. "All witnesses are subject to cross-examination for the purpose of discrediting them by showing bias, prejudice or interest." Jones v. State, 385 So.2d 132, 133 (Fla. 4th DCA 1980). Johnson could have made this plea to the judge, the sentencer, and we find no error in refusing to let the jury hear his self-serving statement.
During cross-examination of Johnson's mental health experts, the prosecutor asked if they had considered Johnson's past illegal drug use in making their assessments of him. Johnson waived the statutory mitigator of having no prior criminal history and now argues that the prosecutor should have been precluded from questioning his witnesses about their knowledge of his prior criminal history. Again, we disagree with his contention.
We have held "that it is proper for a party to fully inquire into the history utilized by the expert to determine whether the expert's opinion has a proper basis." Parker v. State, 476 So.2d 134, 139 (Fla. 1985); Muehleman. The prosecutor's questions and the experts' answers explored *11 the bases for those experts' opinions and rebutted their conclusions that Johnson's inability to conform his conduct to the requirements of law and his being under extreme mental or emotional distress developed shortly before Johnson committed these crimes. Thus, these questions were relevant, and the trial court did not err in allowing them to be asked and answered.
In considering the aggravators put forward by the prosecutor, the court made findings for each of the three murders. Evans: 1) previous conviction of violent felony; 2) committed while engaged in robbery, kidnapping, and arson; 3) committed for financial gain; and 4) committed in a cold, calculated, and premeditated manner; Beasley: 1) previous conviction of violent felony; 2) committed during a robbery; 3) committed for financial gain; and 4) committed in a cold, calculated, and premeditated manner; and Burnham: 1) previous conviction of a violent felony; 2) committed while fleeing after committing a robbery; 3) committed to avoid or prevent a lawful arrest; and 4) committed in a cold, calculated, and premeditated manner. The trial court considered the statutory mitigators that Johnson had not waived and the nonstatutory mitigators that he asked the court to consider, i.e., whether he was under the influence of drugs when he committed these crimes, whether he suffered a drug dependency that contributed to these crimes, and whether he suffered emotional abuse or handicap during childhood. E.g., Lucas v. State, 568 So.2d 18 (Fla. 1990). The court found that none of the mitigators had been established by the evidence.
Johnson now argues that the court erred in finding the pecuniary gain aggravator for Beasley's murder and in finding committed in a cold, calculated, and premeditated manner for all three murders and in not finding that his proposed mitigators had been established. The prosecution agrees that, because the felony in the Beasley murder was robbery, the trial court should not have found both committed during a robbery and for pecuniary gain for that murder. Therefore, we strike the pecuniary gain aggravator for Beasley's killing. We disagree, however, with the rest of Johnson's contentions.
"When there is a legal basis to support finding an aggravating factor, we will not substitute our judgment for that of the trial court." Occhicone v. State, 570 So.2d 902, 905 (Fla. 1990), cert. denied, ___ U.S. ___, 111 S.Ct. 2067, 114 L.Ed.2d 471 (1991). To support finding the cold, calculated, and premeditated aggravator there must be a plan or prearranged design. Rogers v. State, 511 So.2d 526 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988). The facts in this case demonstrate that Johnson had a plan or design which culminated in these killings and support the trial court's finding all three murders to have been committed in a cold, calculated, and premeditated manner. Johnson left the Carters' home armed, intending to rob whomever he could and to hurt anyone who got in his way. He summoned the taxicab under the guise of a legitimate fare, abducted the driver, shot him three times with the fatal shot administered execution style, and set the taxicab on fire in an attempt to destroy evidence of his having been in it. Johnson then proceeded to an all-night restaurant and persuaded Beasley and Reid to give him a ride. During that ride, again through subterfuge, Johnson enticed Beasley from the car and, after Reid drove away, marched Beasley away from the road to where the body could not be seen, shot him once in the head in the manner of an execution, and left with Beasley's money. Johnson's plan to complete his night of robbery successfully culminated in Burnham's murder. After struggling with Burnham, who wound up incapacitated by two gunshot wounds, Johnson killed him with another executionstyle shot to the head. This sequence of events illustrates Johnson's purposeful conduct and supports the trial court's finding that all three murders were committed in a cold, calculated, and premeditated manner.
A trial court must consider the proposed mitigators to decide if they have been established and if they are of a truly mitigating nature in each individual case. Campbell v. State, 571 So.2d 415 (Fla. *12 1990); Rogers. It is the trial court's duty to decide if mitigators have been established by competent, substantial evidence and to resolve conflicts in the evidence. Sireci v. State, 587 So.2d 450 (Fla. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1500, 117 L.Ed.2d 639 (1992). When there is competent, substantial evidence to support a trial court's rejection of mitigators, that rejection will be upheld. Ponticelli v. State, 593 So.2d 483 (Fla. 1991), petition for cert. filed, no. 91-8584 (U.S. June 8, 1992); Shere v. State, 579 So.2d 86 (Fla. 1991).
Here, the trial court fully considered and discussed the mitigators that Johnson argued applied to his committing these murders. As found by the trial court:
There is evidence tending to show that the defendant was under the influence of drugs at the time of the alleged offenses. There is also evidence to show that the defendant had been a regular drug user. However, the evidence also shows that he clearly was not under extreme mental or emotional disturbance because of the use of these drugs based on observations of him after and before the murders. Based on his actions and physical events that took place during the course of the commission of these crimes, it is clear that the defendant knew and understood his actions and that his actions although they may have been enhanced by the use of drugs, were not such as to place him under the influence to the extent of causing any extreme mental or emotional disturbance. The Court specifically notes that while the doctors' testimony in this regard is to the contrary, the doctor's testimony was based primarily on his conversation with the defendant some nine months after the event took place.
* * * * * *
The defendant in this capital felony was able to appreciate the criminality of his conduct by his actions and by his burning or committing arson of the taxi cab after the murder of the taxi cab driver. Although the doctors have presented argument as to the defendant's use of drugs, it is this Court's finding that based on the evidence the defendant had the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law and they were not substantially impaired by the use of drugs.
... The defendant's action in marching the victim, Darrell Beasley, to a field, taking his wallet and sifting out any incriminating evidence that might be found such as I.D. and photographs show the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law were not substantially impaired by the use of drugs.
... Immediately after the capital felony was committed on Deputy Burnham, the defendant was alert enough to jump out of a ditch, distract the officers while attempting first degree murder on them. He was able to return fire and dodge their bullets escaping from their attempts to subdue him. This, together with the testimony and evidence that was presented as to the events leading to Deputy Burnham's death, shows that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was not substantially impaired.
* * * * * *
The defendant is this case used drugs on a large scale whether he needed to or not. He apparently depended on drugs to attain a state of euphoria. However, this desire to feel good perhaps even reached a point where his inhibitions were or may have been lowered cannot be said to be a contributing factor in committing the crimes in this case. Euphoria notwithstanding, the defendant knew what he was doing and was able to distinguish right from wrong as well as the criminality of his conduct. It is the Court's opinion that there is no mitigating circumstances under this condition.
* * * * * *
While his childhood may not have been a happy one such does nothing in mitigation of his conduct in this case.
*13 While voluntary intoxication or drug use might be a mitigator, whether it actually is depends upon the particular facts of a case. Here, the evidence showed less and less drug influence on Johnson's actions as the night's events progressed and support the trial court's findings. There was too much purposeful conduct for the court to have given any significant weight to Johnson's alleged drug intoxication, a self-imposed disability that the facts show not to have been a mitigator in this case. E.g., Bruno v. State, 574 So.2d 76 (Fla.), cert. denied, ___ U.S. ___, 112 S.Ct. 112, 116 L.Ed.2d 81 (1991). Therefore, we find no error in the trial court's consideration and treatment of Johnson's proposed mitigating evidence.
Striking a single aggravator would not affect these sentences, and the trial court's erroneous finding of pecuniary gain for the Beasley murder was harmless error. E.g., Pettit v. State, 591 So.2d 618 (Fla. 1991). Therefore, we affirm Johnson's sentences of death.
During our consideration of this case, the United States Supreme Court decided Espinosa v. Florida, ___ U.S. ___, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), and held our former instruction on the heinous, atrocious, or cruel aggravator insufficient. Although the trial court gave Johnson's jury the instruction struck down in Espinosa, we hold the error to have been harmless. Both the state and the defense requested an expanded instruction on this aggravator, but the court decided to give the standard instruction. In closing argument the state listed the aggravators, but did not dwell on this one or mention it again. The defense explained the aggravator, telling the jury, among other things, that it was meant "to separate those crimes of torture, of excessive wickedness, vileness of the person wanting to inflict not just death, but inflict pain" and that the facts did not support finding it. In addition to this argument the court instructed the jury that its recommended sentence "must be based on the facts as you find them from the evidence." During its consideration of the sentence, the court specifically found the evidence insufficient to support this aggravator. As stated by the Supreme Court, a jury is "likely to disregard an option simply unsupported by evidence." Sochor v. Florida, ___ U.S. ___, ___, 112 S.Ct. 2114, 2122, 119 L.Ed.2d 326 (1992). We see no way that the instruction abrogated in Espinosa could have affected the jury's consideration as to what sentence it would recommend. Therefore, reading that instruction to the jury was, beyond doubt, harmless error.
There is no merit in Johnson's argument that we should have granted his motion to reconstruct the record.
In conclusion, we affirm Johnson's convictions and sentences.
It is so ordered.
BARKETT, C.J., and OVERTON, McDONALD, SHAW, GRIMES, KOGAN and HARDING, JJ., concur.