POLSTON, J.,
dissenting.
I would not vacate Johnson’s three death sentences and remand for a new penalty phase because, unlike the majority, I do not believe a reversible violation under Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), occurred.
A Giglio claim alleges that a prosecutor knowingly presented false and material testimony against a defendant. Initially, a defendant must demonstrate that the prosecutor presented false testimony and that the prosecutor knew the testimony was false. Guzman v. State, 941 So.2d 1045, 1050-51 (Fla.2006). Then, the evidence is deemed immaterial if there is no reasonable possibility that it affected the sentence. See id. The State bears the burden of establishing that the testimony was not material by proving that it was harmless beyond a reasonable doubt. Id.
In this case, even assuming that the testimony at issue was false and that the prosecutor knew it was false,[22] a reversible *75 Giglio violation did not occur because the testimony was immaterial. When viewed in context, there is no reasonable possibility that Smith’s testimony affected Johnson’s death sentences.
First, Smith’s testimony was brief and extensively impeached, making it unlikely that the jury and the sentencing judge relied on it. Smith’s credibility was effectively attacked by defense counsel. Smith conceded on cross-examination that he had a lengthy criminal history and that he had worked as an informant in multiple cases in order to receive favorable treatment. He then admitted that he was motivated to provide information against Johnson by the implicit promise of a reduced sentence and that, after providing information in Johnson’s case, his prison sentences were vacated and he was set free. Smith also admitted that he knew the facts and circumstances of Johnson’s crimes because he had read the police reports and other discovery materials to Johnson. Furthermore, Smith disclosed that his regular drug use had negatively affected his ability to recall matters when testifying in this case.
Second, Smith’s testimony about the cold-blooded nature of Johnson’s crimes was cumulative, thereby eliminating any reasonable possibility that Smith’s testimony caused the jury in the penalty phase to emphasize “the deliberate nature of the killings [which then] caused jurors to discount the proposed mental health mitigation.” Majority op. at 72. For instance, Shayne Carter testified that when Johnson left the Carters’ home the evening of the murders, “Johnson said that he was going to get money for more drugs and that ‘if he had to shoot someone, he would have to shoot someone.’ ” Johnson v. State, 608 So.2d 4, 6 (Fla.1992) (quoting Carter’s testimony). Additionally, Amy Reid, who was with Beasley in the car before he was shot, identified Johnson as the killer and explained that she saw Johnson holding a handgun pointed at Beasley at the rear of the car after Johnson had asked Beasley to stop driving so he could urinate and then asked Beasley to come to the rear of the car. See id. at 7. Officers Allison and Darrington, who arrived on the scene after Beasley’s and Burnham’s murders, testified concerning their positive identifications of Johnson and their exchange of gunfire with Johnson. See id. Carter also testified that after the murders Johnson said that “he hit the deputy with his handgun when told to place his hands on the patrol car and then struggled with him, during and after which he shot the deputy three times.” Id.
Third, there is no reasonable possibility that Smith’s “play like he was crazy” statement affected Johnson’s sentences by causing the jury to discount Johnson’s proposed mental health mitigation. As the majority explains, Johnson’s proposed mental health mitigating circumstances included that at the time of the killings Johnson “was under the influence of drugs, or he suffered from a disorder of drug dependency that contributed to his committing the crimes.” Majority op. at
*76 71. The majority concludes that Smith’s statement that Johnson said he was going to “play like he was crazy” to escape punishment caused the jury to conclude that this and the other proposed mental health mitigation was inapplicable to Johnson. Majority op. at 72. However, while Smith’s testimony included the “play like he was crazy” statement, it also included other more numerous and descriptive statements that supported Johnson’s proposed drug abuse mitigators. Smith testified that Johnson said he was abusing drugs before, during, and after the murders and that this drug use negatively altered his mental status. For example, on cross-examination, Smith testified that Johnson said that he was high from shooting up speed when the murders occurred and that Johnson indicated that he could not remember certain things. In fact, Smith stated that Johnson had said that he had been high for four days before the incident and had stayed high until he was arrested. Johnson further explained to Smith that he was out of control on crystal meth and out of his head at the time of the murders. Smith also testified that Johnson told him he flipped out when he went to the first appearance hearing and heard the charges regarding what he had done because “it all came to life at that point in time.” Therefore, because Smith’s testimony included many statements supporting the proposed drug mitigators, Smith’s testimony taken as a whole could not have led the jury to conclude that Johnson’s proposed mental health mitigation was inapplicable to Johnson.
In light of the fact that Smith’s testimony was brief, effectively impeached, cumulative, and included statements supporting Johnson’s proposed drug use mitigators, there is no reasonable possibility that it affected Johnson’s sentences. Therefore, no reversible Giglio violation occurred. Accordingly, I respectfully dissent from the majority’s decision to vacate Johnson’s three death sentences and remand for a new penalty phase. I would affirm the denial of Johnson’s postconviction motion.

. The trial court found in its order denying relief that Mr. Pickard's notes and the testimony regarding the meaning of those notes do not support the conclusion that false testimony was knowingly presented at the suppression hearing. In reaching this conclusion, the trial court found that, when *75 testifying at the evidentiary hearing, “Mr. Pickard did not recall the interviews and he could not say with certainty what his notes meant.” The trial court also noted in its order that "Mr. Pickard testified that the notes were not verbatim statements of the witnesses” and that Mr. Pickard "did not think his notes were of sufficient quality that he could say they contradicted testimony given by Mr. Smith and Mr. Wilkerson.” But the majority finds certainty in Mr. Pick-ard's recollection of the Smith interviews at the time of the evidentiary hearing where the trial court found no certainty. Cf. Brown v. State, 959 So.2d 146, 149 (Fla. 2007) (“This Court does not reweigh the evidence or second-guess the circuit court's findings as to the credibility of witnesses.”).