769 So.2d 990 (2000)
Paul Beasley JOHNSON, Appellant,
v.
STATE of Florida, Appellee.
No. SC90743.
Supreme Court of Florida.
July 13, 2000.
Rehearing Denied October 11, 2000.
*991 Gregory C. Smith, Capital Collateral Regional CounselNorthern Region, Andrew Thomas, Chief Assistant CCC and Heidi E. Brewer, Assistant CCCNorthern Region, Tallahassee, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Candance M. Sabella, Assistant Attorney General, Tampa, Florida, for Appellee.
*992 PER CURIAM.
Paul Beasley Johnson, a prisoner under sentence of death, appeals the circuit court's denial of his motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.850. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm the circuit court's denial.

PROCEDURAL HISTORY
Johnson was convicted in 1981 of three counts of first-degree murder for the murders of William Evans, Ray Beasley, and Theron Burnham. The facts of this case are set forth in detail in our opinion on Johnson's second direct appeal. See Johnson v. State, 608 So.2d 4 (Fla.1992). Johnson also was convicted of kidnaping, arson, two counts of robbery, and two counts of attempted first-degree murder. The trial court sentenced Johnson to death for each of the three murder convictions, and this Court affirmed the convictions and sentences. Johnson v. State, 438 So.2d 774 (Fla.1983). After a death warrant was signed in January 1986, Johnson petitioned this Court for a writ of habeas corpus, claiming ineffective assistance of appellate counsel for failure to challenge the trial court's allowing the jury to separate after it began deliberating Johnson's guilt or innocence. This Court found reversible error in the court's failure to keep a capital case jury together during deliberations and granted Johnson a new trial. Johnson v. Wainwright, 498 So.2d 938 (Fla.1986). Johnson's retrial, which began in Polk County in October 1987, ended in a mistrial based on juror misconduct. Subsequently, Johnson filed motions to disqualify the trial judge and change venue. These motions were granted, and Johnson was tried in Alachua County in April 1988. Johnson was again convicted of three counts of first-degree murder and sentenced to death. This Court affirmed Johnson's convictions and sentences. Johnson, 608 So.2d at 6.
In August 1994, Johnson filed his initial postconviction motion under Florida Rule of Criminal Procedure 3.850. The circuit court dismissed the initial motion without prejudice to file a subsequent postconviction motion, and Johnson appealed the dismissal to this Court.
During the pendency of the appeal, Johnson filed an amended rule 3.850 motion. The amended motion was dismissed for lack of jurisdiction by the circuit court. On August 29, 1995, this Court dismissed the pending notice of appeal and directed the trial court to reinstate the amended rule 3.850 motion and proceed with the hearing. During this period, public records litigation pursuant to chapter 119, Florida Statutes, was ongoing in the case. On July 26, 1996, the circuit court found that Johnson had received all of the public records to which he was entitled and ordered Johnson to file an amended 3.850 motion by September 16, 1996. Judge Bentley, a successor judge, was assigned to the case. Johnson filed his amended 3.850 motion, and while the motion was pending, Judge Bentley ordered that a Huff[1] hearing be held on January 9, 1997, to determine whether any of the claims in the 3.850 motion required an evidentiary hearing and ordered that memoranda on the issue be filed by December 27, 1996.
On December 26, 1996, Johnson filed a motion to hold the Huff proceedings in abeyance. Johnson claimed that records from the Hillsborough County state attorney's office that had not been provided to Johnson had been found at the Attorney General's office. Johnson requested an opportunity to review the records and to amend his 3.850 motion and that the public records issue be reopened.
The circuit court granted Johnson permission to issue a subpoena duces tecum to Karen Cox, the records custodian for the *993 Hillsborough County State Attorney's Office and to argue the merits of Johnson's public records claim at the January 9, 1997, hearing. After the hearing, the circuit court granted Johnson an additional twenty days in which to file documents detailing the new matters discovered as a result of the newly discovered public records and a proposed amended 3.850 motion. On January 22, 1997, the circuit court issued a nonfinal order summarily denying a portion of Johnson's rule 3.850 motion that was filed in September 1996 and stating that the remaining claims would be heard at an evidentiary hearing to be held on March 3, 1997.
On January 28, 1997, Johnson filed a list detailing new matters allegedly raised by the newly discovered public records. Johnson also filed unsuccessful motions for leave to conduct depositions and to disqualify Judge Bentley and a proposed amended rule 3.850 motion.[2]
The circuit court issued an order on February 3, 1997, accepting Johnson's proposed amended rule 3.850 motion. The circuit court found that Johnson had not raised any entirely new claims in the amended rule 3.850 motion and adopted the findings of its January 22, 1997, order regarding the claims that were summarily denied and those that would be the subject *994 of the evidentiary hearing.[3] The order also stated that Johnson could use any of the newly discovered evidence in support of the claims that would be the subject of the evidentiary hearing. The circuit court also gave Johnson an additional five days in which to submit a memorandum of any new claims that were discovered as a result of public records discovered at the Attorney General's office. On February 7, 1997, Johnson filed a motion requesting sixty days to review those records. The circuit court denied the motion and ordered that Johnson be prepared to litigate his rule 3.850 motion at the evidentiary hearing scheduled for March 3, 1997.
After the evidentiary hearing, the circuit court issued an order on March 19, 1997, summarily denying thirteen of Johnson's twenty-seven claims. State v. Johnson, No. 81-0112A1 (Fla. 10th Cir. Ct. order filed Mar. 19, 1997). After setting forth analysis and record attachments, the court found the remaining fourteen claims to be without merit.

ISSUES ON APPEAL
In this appeal, Johnson raises eight claims. Johnson argues that: (I) the circuit court erred in denying Johnson an evidentiary hearing or additional discovery concerning his public records request; (II) the circuit court erred in denying Johnson's motion to disqualify Judge Bentley; (III) the circuit court erred in denying Johnson's claim that the State withheld material exculpatory evidence rendering counsel ineffective at the guilt phase; (IV) the circuit court erred in denying Johnson's claim that counsel was ineffective at the penalty phase of Johnson's trial; (V) the circuit court erred in denying Johnson's claim that his constitutional rights were violated by counsel's failure to obtain an adequate mental health evaluation and failure to provide necessary background information to the mental health consultants; (VI) the circuit court erred in summarily denying Johnson's claims; (VII) the circuit court erred in ruling that venue was appropriate in Polk County for hearing Johnson's rule 3.850 motion; and (VIII) the circuit court erred in refusing to consider Johnson's cumulative error claim.

Claim I. Public Records
Johnson argues that the circuit court erred in declining to provide him additional time to review the state attorney records that were discovered in the Attorney General's office. Johnson also argues that public records are missing and that the circuit court erred in refusing to conduct an evidentiary hearing concerning the matter.
As to Johnson's first claim, as illustrated in the procedural history set forth above, Johnson had sufficient time to review the records discovered in the Attorney General's office. In its order the circuit court stated:
On July 22, 1996, Judge Robert L. Doyel found that the defendant's attorneys, members of the Office of the Capital Collateral Representative (hereinafter "CCR") had "received all of the public records to which it is entitled" and ordered CCR to file the amended rule 3.850 motion by September 16, 1996....
On December 26, 1996, CCR filed a motion to hold proceedings in abeyance because "[a]n inspection of the Attorney General's records has revealed that public records exist that have not been provided to Mr. Johnson's attorneys." The alleged records originate from the Office of the State Attorney for the Thirteenth Judicial Circuit. On January 9, 1997, the court held a hearing on the motion. During the hearing, CCR represented that on December 16, 1996 (two months after the amended rule 3.850 motion was filed), an investigator went to the Attorney General's Office in Tampa to inspect public records relating to the defendant. During the search, CCR discovered numerous *995 original documents from the state attorney's office for the Thirteenth Circuit. Both assistant state attorney Karen Cox, who handles public records requests for the Thirteenth Circuit, and Candace Sabella, the assistant attorney general assigned to the defendant's case, represented that they had no knowledge of the records prior to December, 1996.
Although CCR's delay in examining the records at the attorney general's office was inexcusable, this court permitted CCR to amend the rule 3.850 motion based upon the newly discovered information. CCR filed an amended motion on January 28, 1997. The amended motion did not raise any new claims for relief, but made references to the materials recently discovered. This court accepted the amended motion and allowed CCR to utilize the new material to support any of the claims for relief. An evidentiary hearing was held on March 3, 4 and 5, 1997.
State v. Johnson order at 3-4. The circuit court concluded that the public records issue had been litigated fully and denied further relief.
Johnson cites to Ventura v. State, 673 So.2d 479 (Fla.1996), for the proposition that the circuit court should have allowed Johnson sixty days to review the newly discovered records. In Ventura, however, the State had affirmatively withheld the records being sought. Id. at 481. Here, there has been no showing that the state attorney's files were intentionally concealed. Furthermore, the record reflects that the Attorney General's office had procedures for reviewing its files in October 1995 and that its records were made available during the public records hearings held in July 1996. Notwithstanding Johnson's delay in examining the files, the circuit court permitted Johnson to raise any new claims discovered in these records as late as February 8, 1997, and to use any evidence discovered in support of his rule 3.850 claims at the March 3, 1997, evidentiary hearing. Accordingly, we find no abuse of discretion in the circuit court's refusal to allow Johnson additional time to review the records.
Similarly, Johnson's claim that records are missing and that he was entitled to an evidentiary hearing on the issue of public records is also without merit. Johnson argues that records obtained from the Hillsborough County state attorney's office are incomplete because records that "should and routinely exist" had not been provided and because records contain references to interviews, but no documents regarding these interviews were provided. Johnson also argues that the testimony of Cox, the records custodian, was inadequate to ensure that all the records had been provided because Cox had no personal knowledge of how the records were searched.
The postconviction motion and the record conclusively show that the defendant is entitled to no relief. In Downs v. State, 740 So.2d 506, 510 (Fla.1999), the defendant argued that an evidentiary hearing should have been held based on his allegation that a sheriff's office file was relatively small and the fact that the record custodian testified that he had no personal knowledge as to whether each department within the sheriff's office had complied with the disclosure request. Id. This Court found that the fact that the records custodian did not know whether all the documents requested were given to him for disclosure, standing alone, did not mean that additional records existed. Id. at 511. This Court also found that, considering the State's and sheriff's assertion that all records had been provided and the absence of any colorable claim that records existed, the motion for an evidentiary hearing on the issue of public records was properly denied. Id.
In accord with Downs, the circuit court did not abuse its discretion in denying Johnson an evidentiary hearing or additional discovery based on Johnson's bare allegations that additional records "should" exist. The State and Cox indicated that all records had been provided. Cox testified *996 at the January 9, 1997, hearing that while she did not physically check the records herself, she indicated that the procedure used to check records was that a request would be made of the records center. Cox testified that this procedure was followed, and those parties indicated that no additional records existed. The fact that Cox did not physically check the records herself does not raise a colorable claim that records exist. Id. See also Mendyk v. State, 707 So.2d 320 (Fla.1997). Accordingly, we find no merit in this claim.

Claim II. Disqualification of Judge Bentley
Johnson's second claim is that the circuit court erred in denying his motion to disqualify Judge Bentley. This issue relates to Johnson's third claim: that the State withheld material and exculpatory evidence from Johnson in the form of an undisclosed agreement it had with a jail-house informant, James Leon Smith, who testified against Johnson at trial. Johnson's motion to disqualify asserted that Judge Bentley sentenced Smith in connection with this agreement and did not disclose this prior involvement in the case, giving rise to Johnson's fear that he would not receive a fair hearing. Johnson's motion also stated that the records discovered at the Attorney General's office contained documents pertaining to Smith and that some of these records had been removed and replaced with blank pages numbered at the bottom. Johnson further asserted that Judge Bentley reviewed, in camera, records that were claimed exempt by the Attorney General's office and ruled they were exempt. Johnson then stated that it was unclear whether the documents claimed to be exempt from disclosure were the same documents missing from Smith's records and that, given Judge Bentley's prior involvement in the case as Smith's sentencing judge, he feared that he would not receive a fair hearing. These allegations are insufficient to support a motion to disqualify.
In order to maintain a motion to disqualify, the motion must establish a well-grounded fear on the part of the movant that he or she will not receive a fair hearing. See Quince v. State, 592 So.2d 669, 670 (Fla.1992). In determining whether a motion to disqualify is legally sufficient, this Court looks to see whether the facts alleged would place a reasonably prudent person in fear of not receiving a fair and impartial trial. See Livingston v. State, 441 So.2d 1083, 1087 (Fla.1983).
Johnson's allegations that Judge Bentley suspended Smith's sentence and held an in-camera review of records that may have pertained to Smith does not set forth a well-grounded fear and fails to show the personal bias or prejudice on the part of the trial judge necessary for disqualification. See Tafero v. State, 403 So.2d 355 (Fla.1981). In Scott v. State, 717 So.2d 908 (Fla.1998), an affiant's sworn statement containing exculpatory information for the defendant was presented to the court to support the defendant's Brady[4] claim. The defendant moved to disqualify the trial judge based on the fact that the judge had presided over an unrelated trial of the affiant, had received correspondence from a jailer or from the affiant in the prior matter, and had commented on the affiant's sentence. Id. at 911. This Court found that allegations of the judge's prior involvement in the affiant's case did not set forth a well-grounded fear of prejudice. Id. Similarly, the fact that Judge Bentley sentenced Smith, without more, does not reasonably demonstrate any predisposition in the mind of Judge Bentley. Circuit judges are called upon to handle many cases, and absent some showing of bias, a motion to disqualify that is based on a judge's prior involvement in a witness's case is insufficient to support a motion to dismiss. Thus, we find that this claim has no merit.

*997 Claim III

A. Henry,[5]Giglio,[6] and Brady Error
Johnson claims that the State withheld material and exculpatory evidence in violation of Brady. Johnson claims that the State withheld the fact that it used another jail inmate, James Leon Smith, to obtain information from Johnson in violation of Henry and withheld the fact that it presented the false testimony of Smith in violation of Giglio.
The basis of these claims rests on Smith's recantation testimony, which was presented during the rule 3.850 evidentiary hearing. The circuit court found with regard to Smith's testimony as follows:
James Leon Smith's [sic] testified at all three of the defendant's trials. He was deposed in 1981 and 1987 and testified at a motion to suppress [hearing] in 1981. His testimony, from 1981 through 1988, was substantially the same. There were minor differences in his testimony, which can be expected because Mr. Smith had to try to recall events that occurred almost seven years ago. Mr. Smith's 1988 trial testimony is summarized below:
Mr. Smith met the defendant in the Polk County jail in 1981. Between February and March of 1981, Mr. Smith had several conversations with the defendant. The defendant admitted to three murders. He said that he had killed a cabdriver and burned the cab because his fingerprints were in it, that he had shot Mr. Beasley and stole $100.00, and that he had struggled with a deputy and that the deputy was shot twice.
While in jail, Mr. Smith met with law enforcement officers and told them that the defendant had made the statements. No one made any promises to Mr. Smith for providing this information. The only assistance he received from the state came in the form of a letter written by the prosecutor in 1981 to a judge considering a motion to mitigate sentence. The mitigation motion was granted and the defendant's sentence was reduced to one year of probation. Mr. Smith testified because "it's something that had to be done." No one suggested that Mr. Smith do anything but tell the truth.
On cross-examination, Mr. Smith provided the following additional information:
There was nothing promised to him for coming forward with information about the defendant. Law enforcement officers did not outright encourage him to go get more information from the defendant. While in the jail, Mr. Smith read the defendant's discovery materials to him because the defendant told Mr. Smith that he could not read. During their conversations, the defendant told him that he was pretty high when the murders occurred and that he could not remember certain details. The defendant also stated that he had done so many drugs that he lost control of himself and started flipping out.
On re-direct examination, Mr. Smith testified that the defendant said that "he could play like he was crazy and they would send him to the crazyhouse for a few years and that would be it."
The court has reviewed the numerous transcripts that contain Mr. Smith's testimony. In every court proceeding, Mr. Smith's testimony was essentially the same as that presented to the Alachua County jury in 1988.
At the evidentiary hearing on March 4, 1997, James Leon Smith testified that much of his previous testimony was untrue. On direct examination, Mr. Smith testified that Polk County Sheriffs Office Detective Wilkerson specifically told him what to ask the defendant. Mr. *998 Smith also alleged that law enforcement told him to testify in court that law enforcement had not instructed him to speak with the defendant. Law enforcement also allegedly promised Mr. Smith that they would go speak to the judge and seek a reduction of his sentence, but that he should not tell the jury about this promise. According to Mr. Smith, the defendant never stated that he would play crazy. Mr. Smith stated that he received most of the information that he originally testified about from either law enforcement or the defendant's discovery materials.
On cross-examination, Mr. Smith's testimony became very vague. He admitted that the defendant may have actually admitted to several of the crimes and provided some details about the crimes to him. However, in general Mr. Smith's memory was not that accurate as to where he received the information about the crimes. He also stated that he had suffered retribution, both in prison and in his hometown, for his prior testimony incriminating the defendant. Mr. Smith could not explain why his testimony had been consistent in numerous court proceedings and had suddenly changed. He alluded to the fact that he did not want someone to die because of his untrue testimony. However, Mr. Smith never came forward after the defendant was originally convicted and sentenced to death in 1981.
In Armstrong v. State, 642 So.2d 730 (Fla.1994), cert. denied, 514 U.S. 1085, 115 S.Ct. 1799, 131 L.Ed.2d 726 (1995), the Florida Supreme Court reaffirmed the proposition that "[r]ecantation by a witness called on behalf of the prosecution does not necessarily entitle a defendant to a new trial. Brown v. State, 381 So.2d 690 (Fla.1980), cert. denied, 449 U.S. 1118, 101 S.Ct. 931, 66 L.Ed.2d 847 (1981); Bell v. State, 90 So.2d 704 (Fla.1956)." This court must make two findings. First, the court must determine whether Mr. Smith's recantation is true. If so, the court then must determine whether Mr. Smith's new testimony would probably result in a different verdict at a new trial. Glendening v. State, 604 So.2d 839 (Fla. 2d DCA 1992).
As to the first issue, the court finds that Mr. Smith's testimony is not credible. In general, recanting testimony is "exceedingly unreliable." Bell v. State, 90 So.2d 704, 705 (Fla.1956). Numerous factors indicate that James Smith's recantation is likewise unreliable.
Lee Atkinson, the man who prosecuted the defendant in 1988, testified at the evidentiary hearing. After his appointment to the case in 1987, Mr. Atkinson prepared for the re-trial by reviewing the case file and the 1981 trial transcripts, reading the Supreme Court opinion and meeting with law enforcement. He then arranged a meeting with James Smith so that he could determine whether he wanted to use Mr. Smith as a witness. Mr. Atkinson testified that he told Mr. Smith that he wanted him to tell the truth and to tell the jury about any deals or promises he may have received in exchange for his testimony. The prosecutor specifically told Mr. Smith that he did not need his testimony to convict the defendant. Mr. Atkinson then asked Mr. Smith if his prior testimony was true. Mr. Smith said that it was. When asked about the defendant's allegations that Mr. Smith was a state agent and was promised specific assistance from law enforcement for his testimony, Mr. Smith denied all the allegations and reaffirmed that he was coming forward voluntarily. Mr. Atkinson also told Mr. Smith that he would not prosecute him for perjury if he said that he lied in 1981, but that Mr. Smith had to tell him about it right now. Mr. Smith replied that everything he testified to was the truth. The prosecutor also stated that if it was within his power, he would prosecute Mr. Smith for perjury if he came forward ten years later and said that he had lied. As it turned out, *999 Mr. Smith did not wait the full ten years before coming forward with a new story.
Looking to jury instruction 2.04 on the credibility of witnesses as a framework for analysis:
(a) Did James Smith seem to have an accurate memory? On direct examination, Mr. Smith appeared to be able to answer many of CCR's leading questions. However, on cross-examination by the state attorney, Mr. Smith's memory faltered numerous times and he had difficulties answering questions. Many of his answers became less and less specific and Mr. Smith appeared to have trouble remembering certain details and events.
(b) Was James Smith honest and straightforward in answering the attorneys' questions? See, analysis under (a), above.
(c) Did James Smith have some interest in how the case should be decided or had any pressure or threat been used against James Smith that affected the truth of his testimony? As noted, Mr. Smith testified that he had suffered because of his original testimony. Apparently, it was well known in prison and on the street that he had testified against the defendant. By changing his story now, the state argued that Mr. Smith would no longer be a snitch in the eyes of the defendant's friends and others.
(d) Did James Smith at some other time make a statement that is inconsistent with the testimony he gave in court? As noted, Mr. Smith gave at least six prior (and consistent with each other) sworn statements that are inconsistent with his testimony given at the evidentiary hearing.
(e) Was it proved that James Smith had been convicted of a crime? It was undisputed that Mr. Smith had been convicted at least six times in the past.
Based upon the court's experience, common sense and personal observations of James Smith, the court is satisfied that his new testimony is false. Simply put, after listening to Mr. Smith, watching his demeanor and analyzing his testimony, the court does not believe his present testimony. Mr. Smith's testimony was consistent throughout the defendant's three trials, a period spanning over seven years. Mr. Smith never came forward with any allegations that his testimony was untruthful until 16 years after his first meeting with the defendant.
Even if the court were to accept Mr. Smith's testimony as being true, the court is confident that the verdict would not have been different. Evidence of the defendant's guilt was overwhelming. At trial, the state presented eyewitness testimony, circumstantial evidence and evidence of the defendant's conduct which indicated the defendant committed the crimes and that he was not insane at the time of the offenses. Furthermore, Lee Atkinson testified that the result of the trial would have been the same had Mr. Smith never testified. This allegation was not challenged by the defendant during the evidentiary hearing.
In conclusion, the court finds that the testimony of James Smith presented at the evidentiary hearing is false. Furthermore, even if the court were to accept the testimony, the court finds that the result of the trial would not have changed. Therefore, there were no violations of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). There has been no competent evidence presented of either prosecutorial misconduct or improper and unconstitutional police practices. Finally, there has been no showing that trial counsel was ineffective in any way related to the testimony of James Smith.
State v. Johnson order at 6-10 (citations omitted).
*1000 Our review of the record demonstrates that the trial court's finding that Smith's testimony was not believable is supported by competent substantial evidence. This Court will not substitute its judgment for that of the trial court on issues of credibility. See Demps v. State, 462 So.2d 1074 (Fla.1984). We approve the trial court's denial of this claim.

B. Guilt-Phase Ineffective Assistance of Counsel
Also within claim III, Johnson raises subclaims of ineffective assistance of counsel at the guilt phase of Johnson's trial. Johnson claims that counsel was ineffective by: (1) improperly opening the door to Johnson's statement to fellow inmate Smith that he would "act crazy"; (2) failing to introduce a voluntary intoxication defense; (3) failing to ensure the entire record was complete; and (4) failing to read the entire record.
Our review is guided by the elementary rule in respect to ineffective assistance of counsel claims that the defendant must show that counsel's performance was deficient and that the deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and the defendant bears the burden of proving that the representation was unreasonable under the prevailing professional norms and that the challenged action was not strong strategy. Id. at 688-89, 104 S.Ct. 2052.
As to opening the door to Smith's testimony, the circuit court concluded the following:
(a) The first claim is that counsel was ineffective in cross-examining James Smith because counsel opened the door to the state and allowed the introduction of damaging evidence. The specific complaint is that trial counsel asked Mr. Smith about several details of a February 11, 1981, conversation that Mr. Smith had with the defendant. One portion of the conversation dealt with the fact that the defendant told Mr. Smith that he had taken a large quantity of drugs and that he was out of control during the crimes. On re-direct, the state asked Mr. Smith about the rest of the conversation and if the defendant had made any comment about his intended defense. Mr. Smith then testified that the defendant told him that he could play like he was crazy and they would send him to the crazyhouse for a few years and that would be it.
At the evidentiary hearing, both Mr. Norgard and Mr. Shearer testified that they knew what Mr. Smith's testimony would be. Both attorneys further stated that there was a tactical reason for asking about the February 11 statement. The defense wanted to introduce evidence of the defendant's drug use to the jury. During this particular conversation with Mr. Smith, the defendant admitted to consuming a large quantity of drugs. Counsel believed that it was important for the jury to hear this evidence, even if they also heard the defendant admit that he would play crazy. Mr. Norgard stated that the defense knew Mr. Smith's testimony was harmful to their case, and he and Mr. Shearer made the decision to try to bring out whatever helpful portions of Mr. Smith's testimony that they could and then suffer through the harmful portions.
Counsel has wide discretion in matters of trial strategy. Mr. Shearer had been through the defendant's other two trials prior to the 1988 trial. He knew the evidence and made an informed, tactical decision about how to question Mr. Smith. The court is satisfied that the strategy, although ultimately unsuccessful, was reasonable and did not constitute deficient performance of counsel.
State v. Johnson order at 14.
The record reflects that attorney Norgard made a tactical decision to use Smith's testimony. When questioned at *1001 the evidentiary hearing concerning the use of Smith's testimony at trial, attorney Norgard responded as follows:
Q. What tactical choices or thinking did you engage in in deciding how to go about bringing out what you wanted?
A. Very simply put, we knew there were going to be negative things coming out from Mr. Smith, regardless of what tactics we took on cross-examination, that he was going to be saying some things damaging to our case. We knew that there were certain items of evidence that he could testify to that would have been supportive of the insanity defense. We also knew that if we had gotten into those statements, the one that everybody points to, the statement about I will just fake that I'm crazy and be out in a few years, you know, we knew that that would come out.
But in the contexts of this particular case, given that there was already damaging testimony from Mr. Smith, we felt that eliciting favorable testimony outweighed the negative aspects of it, particularly given there was some cloud of a question about his credibility that we could argue to the jury as well in terms of the negative things, since he was going to get some benefit and essentially bring out the positive things and show that, you know, despite his leanings and his incrimination to help the statements that, in fact, the truth was that Mr. Johnson was insane.
Counsel's strategic decisions will not be second-guessed on collateral attack. See Remeta v. Dugger, 622 So.2d 452 (Fla. 1993). We approve the circuit court's decision.
As to counsel's failure to present a voluntary intoxication defense, the circuit court found:
Mr. Norgard testified at the evidentiary hearing that the defense presented was insanity due to substantial drug use. Part of the insanity defense would necessarily focus upon the defendant's drug intoxication. Thus, counsel decided that they did not need to present a separate voluntary intoxication defense. Mr. Norgard further testified that, in his experience, juries do not like the intoxication defense and that it was harder to sell to a jury than insanity, which is also unpopular with juries. Mr. Shearer testified that he believed they could not effectively present both the insanity and intoxication defense, as one defense may dilute the strength of the other. Further, he believed that the defense could present the insanity defense without the defendant's testimony, while the defendant might have to testify if they presented the intoxication defense.
The court is satisfied that the tactical decision not to present a defense of voluntary intoxication did not constitute ineffective assistance of counsel. Simply because the insanity defense did not work, it does not mean that the theory of the defense was flawed. Furthermore, the court is convinced that a presentation of an intoxication defense would not have changed the ultimate outcome of the proceedings.
State v. Johnson order at 15.
Again we approve the circuit court's decision. The record reflects that attorney Shearer, when questioned at the evidentiary hearing concerning his decision not to present a voluntary intoxication defense, testified as follows:
Q. Let's talk about your pursuit of a voluntary intoxication defense. I understand what you said would be that you have no notes with which to definitively say what went into that; correct?
A. Yes.
Q. You did however consider that possibility during your trial preparation, didn't you?
A. Yes.
Q. And in fact, there were factors that would have normally come into your consideration, such as the fact that voluntary intoxication might tend to water *1002 down the insanity defense that you, in fact, were going to present?
A. Yeah, I would say that's true.
Q. And that you could present some things in an insanity defense without even confronting the possibility of the defendant having testifying, but there would be a stronger chance of putting him on the stand to try to carry off the voluntary intoxication defense?
A. That is true too.
Q. And that you probably would not have wanted Mr. Johnsonor in fact, had decided not to have Mr. Johnson testify in this particular trial?
A. That is true.
. . . .
Q. You would have also considered the possibility or probability, in your estimate, that intoxication would be more difficult to convince the jury of, than the amphetamine-induced insanity that you were going to go with?
A. That's largelythat's generally true....
As previously stated in this opinion, counsel's strategic decisions will not be second-guessed on collateral attack. Remeta; see also Wilson v. Wainwright, 474 So.2d 1162 (Fla.1985).
As to the issues involving the record on appeal, the circuit court found:
Claim II alleges that the defendant was denied a proper appeal because portions of the record were missing. The substantive complaint is not properly raised in a motion for postconviction relief. Additionally, the claim was raised on direct appeal and decided adversely to the defendant. See, Johnson v. State, 608 So.2d 4 (Fla.1992).
The defendant further complains that counsel was ineffective for failing to ensure that a proper record was made. The court allowed collateral counsel the opportunity to explore the ineffective assistance of counsel aspect of the claim at the evidentiary hearing. Trial counsel Lawrence Shearer testified that he filed a motion to record all proceedings. He believed the motion was granted and that all proceedings were recorded. However, Mr. Shearer testified that he had not read the entire transcript. In any event, the court finds that the defendant has not shown that any actions of counsel were deficient.
State v. Johnson order at 4.
The record reflects that attorney Shearer made a motion to record all of the proceedings and testified at the evidentiary hearing that he did not remember a time during Johnson's trial when the reporter was not taking something down that he thought should have been. Johnson has not shown that this conduct falls outside the "wide range of reasonable professional assistance." Strickland, 466 U.S. at 688, 104 S.Ct. 2052.
Because Johnson has failed to demonstrate a deficiency as to counsel's conduct, it is not necessary to address whether counsel's conduct prejudiced Johnson. In view of the record and the testimony of Johnson's attorneys, we agree with the circuit court that Johnson failed to demonstrate that counsel's performance fell below the Strickland standard. See Strickland, 466 U.S. at 691, 104 S.Ct. 2052.

Claim IV. Penalty-Phase Ineffective Assistance of Counsel
Johnson claims he was denied effective assistance of counsel during the penalty phase of his trial because: (1) counsel failed to perform an adequate investigation in order to obtain necessary background information for mitigation; (2) counsel failed to object to the improper doubling of an aggravator; and (3) counsel failed to object to improper closing argument.
In order to prevail on a claim of ineffective assistance of counsel in the penalty phase of a capital case the defendant must demonstrate that he or she would have probably received a life sentence but for counsel's errors. See Hildwin v. Dugger, 654 So.2d 107, 109 (Fla. *1003 1995). The circuit court found with respect to the first subclaim that:
Trial counsel presented competent evidence to support the only two applicable statutory mitigating circumstances, extreme mental disturbance and capacity to conform conduct impaired. Trial counsel also presented three family members to testify about the defendant's difficult childhood, his abandonment by his parents and his father's alcoholism.
The defendant called several potential mitigation witnesses at the evidentiary hearing. The defendant also made the argument that trial counsel should have called these same people during the 1988 proceeding. The witnesses were Joan Soileau, the defendant's ex-girlfriend; Jane Cormier, the defendant's mother; Joyce Kihs, the defendant's aunt and sister of Jane Cormier; and Steve Johnson, the defendant's brother. The substance of the evidence presented was that the defendant was a great person while he lived in California from 1976 to 1978. He never did drugs or engaged in any violent behavior. Apparently he liked to cook and he helped his girlfriend and mother clean their respective houses.
Trial counsel testified that he attempted to contact the defendant's mother. The defendant provided an address and phone number, but neither were helpful in locating her. Jane Cormier testified that she had moved several times between 1978 and 1988, but that she was available to testify. There has been no evidence presented that suggests that counsel's failure to locate Ms. Cormier constituted ineffective assistance. If one's own client cannot provide information on how to locate his own mother, counsel cannot be faulted. The other proposed witnesses also had similar tales of relocating and losing touch with the defendant once he returned to Florida in 1978.
As to the proffered evidence of Ms. Cormier and the other potential mitigation witnesses, the court finds that "there is no reasonable probability that the sentence would have been different even if what was presented to this court had been presented during the penalty phase of the defendant's trial." Stewart v. State, 481 So.2d 1210, 1212 (Fla.1985). Most of the witnesses' knowledge of the defendant came from seeing him for a period of two years while he was in California. What the effectiveness of such a narrow look into the defendant's character and personality would have been is questionable at best. In addition, evidence that the defendant could conform his conduct and refrain from drug use during the California years could have been harmful to some aspects of the case. Having decided that the proposed mitigation evidence would not have made any difference on the outcome of the trial and sentence, counsel cannot be ineffective for failing to present such evidence.
State v. Johnson order at 12-13.
We agree with the circuit court that Johnson has not shown any deficiency on the part of counsel for failing to pursue additional testimony from Johnson's family members. At the evidentiary hearing, attorney Shearer admitted that he attempted to locate all of the people Johnson gave him information about. In addition, several of the potential witnesses testified that they had moved frequently since their last contact with Johnson. This is not a case in which counsel neglected to make any attempts to locate mitigation witnesses, and counsel's actions were not outside the broad range of reasonably competent performance of counsel. See Ferguson v. State, 593 So.2d 508 (Fla.1992).
Even if Johnson had made a showing that counsel's actions in not presenting the testimony of additional witnesses was deficient, Johnson did not demonstrate that but for the lack of this testimony he would have received a life sentence. The trial *1004 judge found no mitigation and found aggravation for each of the murders as follows:
Evans: 1) previous conviction of violent felony; 2)committed while engaged in robbery, kidnapping, and arson; 3) committed for financial gain; and 4) committed in a cold, calculated, and premeditated manner; Beasley: 1) previous conviction of violent felony; 2) committed during a robbery; 3) committed for [pecuniary] gain; and 4) committed in a cold, calculated, and premeditated manner; and Burnham: 1) previous conviction of a violent felony; 2) committed while fleeing after committing a robbery; 3) committed to avoid or prevent a lawful arrest; and 4) committed in a cold, calculated, and premeditated manner.
Johnson v. State, 608 So.2d 4, 11 (Fla. 1992).
On direct appeal, this Court struck the "committed for pecuniary gain" aggravator in the Beasley murder, but otherwise affirmed Johnson's convictions and sentences. Id. Testimony from Johnson's mother and ex-girlfriend that Johnson was a good person, considered together with the aggravating circumstances surrounding these three murders, would not have changed the result.
Regarding the second subclaim that counsel was ineffective for failing to object to the jury instruction regarding the improper doubling of an aggravator, the circuit court correctly found that counsel objected to the improper instruction and ensured that the court read the proper instruction. As to the third subclaim, the circuit court correctly found, after reviewing the closing argument, that while there were several objectionable comments during closing arguments, the argument as a whole was proper. Our review of the record demonstrates that Johnson has failed to demonstrate that counsel was ineffective at the penalty phase of Johnson's trial.

Claim V. Mental Health Evaluation
In this claim Johnson alleges that he was unconstitutionally denied his rights under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), by counsel's failure to obtain an adequate mental health evaluation. Johnson also argues in this claim that counsel was ineffective for failing to obtain the proper type of mental health experts and by failing to provide the experts with information regarding Johnson's background and family history. As discussed in this opinion in claim IV, Johnson has not shown that counsel was deficient for failing to pursue additional testimony of Johnson's family. As to the remaining issues, the circuit court found:
The primary allegation is that counsel failed to present evidence of organic brain damage to the jury. A review of the record indicates that the defendant was evaluated by three mental health experts, Doctors McClane, Afield and Ainesworth. All three men are psychiatrists. The doctors indicated that they had reviewed the case file, taken a medical and life history from the defendant, and had reviewed some materials furnished by defense counsel. While the doctors disagreed as to whether the defendant met the legal test for insanity, all three agreed that the defendant suffered from a severe mental or emotional disturbance due to amphetamine intoxication and that his ability to conform his conduct to the requirements of law was impaired.
At the evidentiary hearing, Dr. Brad Fisher, a clinical forensic psychologist, testified for the defendant. Dr. Fisher evaluated the defendant almost 15 years after the crimes occurred. He met with the defendant two times, reviewed the case file, school, prison and police records of the defendant and met with the defendant's mother and brother. Dr. Fisher testified that he did not disagree with the mental health experts who testified at the 1988 trial. He believes that the defendant suffers from toxic psychosis *1005 and did so during the crimes. His opinion is that the defendant suffered from an extreme mental disturbance and his ability to conform his conduct to the requirements of law was substantially impaired. The only difference in Dr. Fisher's diagnosis of the defendant is that he believes the defendant suffers from organic brain damage due to extensive drug use. None of the prior mental health experts testified to any organic brain damage.
The defendant argues that had trial counsel provided the mental health experts with the same materials that CCR provided Dr. Fisher, they would have either diagnosed organic brain damage or would have recommended additional testing by a psychologist. The court finds, however, that even if the defendant did suffer from organic brain damage and this evidence was presented to the judge and jury, the result would not have changed. The ultimate opinions of the doctors on the defendant's ability to conform his conduct are consistent and were presented to the jury. The defense presented three competent mental health experts. Based upon a review of the trial transcripts and the evidence presented at the evidentiary hearing, the court is confident that Dr. Fisher's finding of organic brain damage is not of such import that it would have changed the jury's verdict or recommendation. There has been no showing that the attorneys' conduct was ineffective in hiring the experts or in the material furnished. There also has been no showing that the mental health experts were ineffective. The defendant seems to argue that because his expert reached a different result that "res ipsa," someone was ineffective.
State v. Johnson order at 11-12, (footnote omitted).
Ake requires that a defendant have access to a "competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." 470 U.S. at 83, 105 S.Ct. 1087. The experts who testified at the evidentiary hearing agreed with the experts who testified for Johnson at his trial. The experts who testified at trial based their conclusions on interviews with Johnson that included information of his family history, drug abuse, and past psychotic episode. No deficiency was shown in their examinations, nor has Johnson shown any deficiency on the part of counsel in hiring or providing information to these experts. Johnson's experts performed all the essential tasks required by Ake, and Johnson has not shown any violation. Accordingly, we find no merit in this claim.

Claim VI. Summary Denial of Claims
Johnson contends that the circuit court erred in summarily denying eighteen claims in his 3.850 motion.[7] We find no error in the circuit court's order. The court properly found eight of these claims to be procedurally barred because they were raised or could have been raised on direct appeal, see Valle v. State, 705 So.2d 1331, 1335 (Fla.1997), and three to be duplicative of issues raised elsewhere in the brief.[8] Three claims were issues that should have been raised on direct appeal but were recast as an ineffective assistance of counsel claim. The circuit court found that the substantive portion of these claims could have been raised on direct appeal or were raised on direct appeal, and after setting forth analysis, the court appropriately found the portion of the claim regarding *1006 ineffective assistance of counsel to be without merit.[9]
Of those remaining, claims 1, 3, and 7 were not summarily denied but were supported with record citation or analysis. Additionally, claim 25 regarding jury misconduct was properly found to be facially insufficient to warrant relief because Johnson failed to make any factual allegations that would support relief. Judge Bentley's order sets forth his rationale for rejecting Johnson's claims, which conclusively shows that Johnson is not entitled to relief. See Hoffman v. State, 571 So.2d 449, 450 (Fla. 1990).

Claim VII. Venue
Johnson claims that the circuit court erred in ruling that venue was appropriate in Polk County for hearing Johnson's rule 3.850 motion. Rule 3.850 requires the initial filing of a motion under this rule in the court that entered judgment. However, the rule does not state that venue must remain in that court. In deciding whether a change of venue is proper a court considers whether the general state of mind of the residents is so infected by knowledge of the case and accompanying prejudice that jurors could not possibly put that information out of their minds and try the case solely on the evidence presented. See McCaskill v. State, 344 So.2d 1276 (Fla. 1977). These same concerns are not raised on a rule 3.850 motion, in which there is no jury. Johnson cites no support for his argument and has not shown how the choice of venue prejudiced him. Thus, this claim has no merit.

Claim VIII. Cumulative Error
Johnson alleges that the circuit court erred in refusing to consider his cumulative error claim. All of Johnson's claims were either meritless or procedurally barred; therefore, there was no cumulative effect to consider. See Melendez v. State, 718 So.2d 746, 749 (Fla.1998).

CONCLUSION
Based on the foregoing, we affirm the circuit court's denial of Johnson's amended rule 3.850 motion.
It is so ordered.
WELLS, C.J., and HARDING and LEWIS, JJ., concur.
SHAW, ANSTEAD and PARIENTE, JJ., concur in result only.
QUINCE, J., recused.
NOTES
[1] Huff v. State, 622 So.2d 982 (Fla.1993).
[2] Johnson raised the following claims in his amended rule 3.850 motion: (1) records in the possession of state agencies were withheld in violation of chapter 119, Florida Statutes, and the United States and Florida Constitutions; (2) Johnson was denied a proper appeal due to omissions in the record; (3) the trial court erroneously instructed the jury as to the cold, calculated, and premeditated aggravator; (4) the trial court erroneously instructed the jury as to the aggravator of a previous conviction of a violent felony; (5) sentencing was unreliable because the judge refused to find mitigation established by the record; (6) the sentencing jury was misled by an argument that unconstitutionally diluted its sense of responsibility for sentencing; (7) the court erroneously instructed the jury that one single act supported two separate aggravators; (8) Johnson received ineffective assistance of counsel in that counsel was rendered ineffective by the State's withholding of material and exculpatory evidence; (9) penalty phase jury instructions improperly shifted the burden to Johnson to prove that death was inappropriate, and failure to object rendered counsel ineffective; (10) Johnson was unconstitutionally denied his rights to an adequate mental health evaluation; (11) Johnson received ineffective assistance of counsel at the penalty phase because counsel failed to adequately investigate and prepare additional mitigating evidence and failed to object to the trial judge's prejudicial comments; (12) newly discovered evidence establishes that Johnson's conviction and sentence are constitutionally unreliable; (13) ineffective assistance of counsel and the prosecutor's improper argument and comment rendered the conviction and sentence fundamentally unfair and unreliable; (14) Johnson received ineffective assistance of counsel during voir dire in that trial counsel was rendered ineffective by the trial court's interference when it repeatedly interrupted trial counsel during jury selection; (15) Johnson received ineffective assistance of counsel in that the jury was allowed to rely upon improperly admitted evidence and trial counsel failed to adequately investigate and prepare a defense or challenge the State's case; (16) Johnson received ineffective assistance of counsel during voir dire in that counsel was rendered ineffective by the trial court's refusal to grant in camera voir dire and its refusal to grant additional peremptory challenges; (17) Florida's capital sentencing statute is unconstitutional because it fails to prevent the arbitrary and capricious imposition of the death penalty and violates due process and the prohibition against cruel and unusual punishment; (18) an unconstitutional automatic aggravator (underlying felony) was applied; (19) Johnson's constitutional rights were violated when the prosecutor impermissibly suggested to the jury that the law required that it recommend a sentence of death; (20) the avoid arrest aggravating factor was improperly applied; (21) the State unconstitutionally used a jailhouse informant to obtain statements from Johnson; (22) Johnson is innocent of the death sentence; (23) the instruction relating to flight after commission of robbery, kidnapping, or arson is unconstitutionally vague and overbroad; (24) rules prohibiting defense counsel from interviewing jurors to evaluate whether juror misconduct existed are unconstitutional; (25) juror misconduct occurred in the guilt and penalty phases of Johnson's trial in violation of his constitutional rights; (26) Johnson received ineffective assistance of counsel by trial counsel's failure to adequately investigate, develop, and present evidence in support of a voluntary intoxication defense; and (27) cumulative errors were not harmless.
[3] The circuit court ordered an evidentiary hearing as to claims 8, 10, 13, 15, 19, and 26.
[4] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[5] United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980).
[6] Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
[7] Johnson claims the circuit court summarily denied claims 1-4, 6, 7, 9, 12, 14, 16-19, 21, 23-25, and 26.
[8] The court found the following claims were procedurally barred because they either could have been raised on direct appeal or were raised on direct appeal and found to be without merit: claims 4, 6, 14, 16, 17, 18, 23, and 24. The trial court found the following claims to be a repeat of earlier claims and summarily denied relief: claims 12, 21, and 26.
[9] The circuit court found that the substantive portions of the following claims could have been raised on direct appeal or were raised on direct appeal and found the portion of the claim regarding ineffective assistance of counsel to be without merit: claims 2, 9, and 19.