# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D17-2727
_____

JERRY WEAKLEY,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

_____

On appeal from the Circuit Court for Leon County.
Angela C. Dempsey, Judge.

June 7, 2019

WINOKUR, J.

A nighttime 911 call from a small, five-mobile-home area at the end of a dirt road reported a suspicious person on a motorcycle walking around a foreclosed home nearby. The caller believed the person might be committing a burglary, but, in the dark of the night, could not provide any additional details and then refused to disclose his or her identity. Two officers responded within minutes, driving down the empty road to the group of mobile homes. Before they got there, Jerry Weakley approached heading in the opposite direction on a motorcycle before aggressively accelerating and veering into the shoulder of the road in an attempt to flee past the officers. Based on the motorcyclist's behavior and the nature of the report, the officers stopped Weakley, discovered the motorcycle to be stolen, and found various articles of contraband. Weakley

moved to suppress the contraband, but the trial court found the officers had reasonable suspicion to stop him. Weakley entered a plea to four charges, reserving the right to appeal the denial of his motion to suppress, which he now does. Because we find that Weakley has not met his burden of proving the trial court's ruling incorrect, we affirm.[1]

> A stop is justified when an officer observes facts giving rise to a reasonable and well-founded suspicion that criminal activity has occurred or is about to occur. In turn, whether an officer's well-founded suspicion is reasonable is determined by the totality of the circumstances that existed at the time of the investigatory stop and is based solely on facts known to the officer before the stop.

*C.E.L. v. State*, 24 So. 3d 1181, 1186-89 (Fla. 2009) (citations omitted) (holding that flight from the police in a high-crime area satisfied reasonable suspicion).

In *Baptiste v. State*, 995 So. 2d 285, 288, 293 (Fla. 2008), an anonymous caller reported a man's alleged criminal activity and responding officers detained the man without observing "any illegal activity, unusual conduct, or suspicious behavior." The supreme court found that the officers lacked reasonable suspicion. While the Court acknowledged that an anonymous tip alone generally does not provide reasonable suspicion for a stop, it made sure to note that anonymous tips could "provide reasonable suspicion under a totality-of-the-circumstances analysis" in certain cases, such as when an officer makes "subsequent *observations* of a suspect who matches the description given." *Id.* at 296-97 (citing *United States v. Gooden*, 273 F.3d 1100, 1100 (5th Cir. 2001) (unpublished opinion), as holding that "even where the anonymous tip alone failed to establish reasonable suspicion, the

---

[1] "The ruling of the trial court on a motion to suppress comes to us clothed with a presumption of correctness and we must interpret the evidence and reasonable inference and deductions in a manner most favorable to sustaining the trial court's ruling." *Presley v. State*, 204 So. 3d 84, 86-87 (Fla. 1st DCA 2016) (quoting *Johnson v. State*, 608 So. 2d 4, 9 (Fla. 1992)).

fact that the suspect reached for his waistband upon seeing officers provided reasonable suspicion for initiation of a *Terry* stop"). The supreme court continued, stating that "nervous behavior of a suspect upon the approach of an officer, when considered in conjunction with a purely anonymous tip, may under the totality of the circumstances establish reasonable suspicion for an investigative stop." *Id.* at 297 (discussing *United States v. Sims*, 296 F.3d 284, 285-87 (4th Cir. 2002), and noting that neither the anonymous tip nor the suspect's nervous and evasive behavior would have independently justified a search, but did so when considered together). Additionally, the "court may consider 'the time of day, the day of the week, the location, the physical appearance and behavior of the suspect, the appearance and manner of operation of any vehicle involved or anything incongruous or unusual in the situation as interpreted in light of the officer's knowledge.'" *Jenkins v. State*, 685 So. 2d 918, 920 (Fla. 1st DCA 1996) (quoting *Gipson v. State*, 537 So. 2d 1080, 1081 (Fla. 1st DCA 1989)).

Considering the totality of the circumstances, and by interpreting the evidence in the manner most favorable to sustaining the trial court's ruling, we conclude that the officers had reasonable suspicion to stop Weakley. A caller reported an unknown individual on a motorcycle walking around an abandoned home one night and believed a burglary might be occurring. Officers quickly responded to the very secluded area down a dirt road in the dark and found a motorcycle approaching. Rather than calmly stop or pull to the side of the road so the officers could pass, Weakley aggressively veered to pass the officers and flee. *Cf. Baptiste*, 995 So. 2d at 296-97; *Tobin v. State*, 146 So. 3d 159, 161-63 (Fla. 1st DCA 2014) (finding no reasonable suspicion where the anonymous calls were not corroborated by suspicious activity as the appellant was stopped when simply leaving the property).

In finding the stop unconstitutional, the dissent makes two mistakes. First, it considers the various indicia of suspicion individually, discounting separately the anonymous call about Weakley lurking around the vacant trailer and his later attempt to evade police. But the Supreme Court recently noted that "the whole is often greater than the sum of its parts—especially when

3

the parts are viewed in isolation" and faulted a lower court for viewing each fact in isolation, as the "totality-of-the-circumstances test 'precludes this sort of divide-and-conquer analysis.'"[2] *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). Applying this rule from *Wesby* and *Baptiste*, Weakley's flight from the police works in conjunction with the report that he may have just committed or attempted a burglary. Second, having determined that neither the anonymous call nor flight was independently sufficient, the dissent concludes that Weakley's flight was not really a flight, but the expected behavior of an approaching motorist, and could not contribute to the reasonable-suspicion analysis. But the officers testified that Weakley's driving was aggressive and indicative of an attempt to flee, and the trial court found that Weakley attempted to flee. The dissent improperly dismisses the trial court's finding and fails to interpret the evidence in the light most favorable to affirmance, as we must. *See Presley*, 204 So. 3d at 86-87. The dissent also repeatedly notes that Weakley was not arrested or cited for a traffic violation for fleeing from police. But conduct does not need to be illegal (or acted upon if so) to be suspicious. The Supreme Court explained that "the relevant inquiry is not whether particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of noncriminal acts." *Wesby*, 138 S. Ct. at 588 (quoting *Illinois v.*

---

[2] The Supreme Court specifically held in *Wesby* that the lower court erred in isolating the questionable circumstances of a group of people found in a vacant home from their subsequent flight from police:

> Instead of considering the facts as a whole, the panel majority took them one by one. For example, it dismissed the fact that the partygoers "scattered or hid when the police entered the house" because that fact was "not sufficient *standing alone* to create probable cause." Similarly, it found "nothing in the record suggesting that the condition of the house, *on its own,* should have alerted the [partygoers] that they were unwelcome."

*Wesby*, 138 S. Ct. at 588 (citations omitted).

*Gates*, 462 U.S. 213, 244 n.13 (1983)). It is thus irrelevant that, as the dissent points out, "no criminal charges or traffic violations were lodged against Weakley, other than the possession charges that arose from his detention." Dissenting op. at 7. We do not need to decide if Weakley's flight may have violated any laws in itself, nor did the officers.[3] It was reasonable to conclude that Weakley attempted to flee when officers approached and that this flight was suspicious in light of the report of a suspected burglary. *See Wesby*, 138 S. Ct. at 587 ("'[U]nprovoked flight upon noticing the police,' we have explained, 'is certainly suggestive' of wrongdoing and can be treated as 'suspicious behavior' that factors into the totality of the circumstances. . . . In fact, 'deliberately furtive actions and flight at the approach of . . . law officers are *strong* indicia of *mens rea*.'" (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124-125 (2000), and *Sibron v. New York*, 392 U.S. 40, 66 (1968))).[4]

Finding no error in the trial court's findings, we agree that the totality of the circumstances shows that the officers had

---

[3] The same is true regarding the failure of the 911 caller to specifically identify a crime that was occurring or had occurred. As *Wesby* notes, conduct does not necessarily have to be criminal to warrant investigation under the reasonable suspicion standard. This has long been part of Fourth Amendment jurisprudence. *See, e.g., Reid v. Georgia*, 448 U.S. 438, 441 (1980) (holding that "there could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot").

[4] We also reject the dissent's implication that the tip could not factor into the reasonable-suspicion analysis because it did not provide a description of Weakley's physical characteristics. A description of an individual with a motorcycle in a very secluded area down a dirt road at night could provide at least as specific of a description as identifying the race and clothing of someone in a public place like a grocery store. *Cf. Baptiste*, 995 So. 2d at 288 ("anonymous caller had reported that a black male wearing a white T-shirt and blue-jean shorts had waved a firearm in front of a grocery store").

5

reasonable suspicion to stop Weakley following his attempted flight.[5] We AFFIRM his convictions.

WINSOR, J., concurs; MAKAR, J. dissents with opinion.

———————————

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

———————————

MAKAR, J., dissenting.

Lowering the bar in this Fourth Amendment anonymous tip case is a limbo dance I cannot join.

Responding to a mid-evening anonymous call about someone pulling up on a motorcycle and walking near a vacant home in a mobile home neighborhood in rural Leon County, Florida, two sheriff's officers separately drove to the area down a narrow, unlit, and bumpy "two-rut" road (Comet Drive). The anonymous caller refused to be identified, gave no physical characteristics of the person (e.g., gender, race, height/weight) or the motorcycle (e.g., make, size, color), saw no criminal activity, and expressed only a generalized concern that a burglary might be in the works. When an approaching motorcycle's headlight came into view,[1] the officers—without their blue lights on—continued to drive slowly

———————————

[5] Because we find the officers had reasonable suspicion for the stop, we do not address the State's alternative argument the contraband would have been discovered inevitably.

[1] The mischaracterization in the majority opinion that "Weakley [was] lurking around the trailers" and "was suspected of burglary" has no evidentiary support. The anonymous caller provided no description of the person including gender (so who's to say it was Weakley?) didn't say the person was "lurking" (the person was merely "walking" near the home) and saw no burglary or other illegal conduct (expressing only generally that something might be afoot).

6

(10-15 mph) forward until the motorcycle turned into a small bypass area where, when two vehicles meet, one gets out of the way. At that moment, the first officer—believing the motorcyclist might be taking flight—activated his vehicle's blue lights, exited the vehicle, and immediately detained and began questioning the driver, Jerry Weakley, who was simultaneously blocked in by the second officer's closely trailing squad car, which was just "a few feet" behind. Weakley—detained within seconds—made no attempt to flee. The officers ran the motorcycle's license plate, determined it was reported as stolen, and—after searching Weakley—arrested him for possession of a firearm by a felon, for possession of paraphernalia, and for theft of the motorcycle (the latter charge was later dropped due to lack of a good faith basis to prosecute). No burglary, trespass, or any other criminal activity was discovered in the neighborhood, and no criminal charges or traffic violations were lodged against Weakley, other than the possession charges that arose from his detention.

Weakley pleaded guilty to the possession charges and appeals the denial of his motion to suppress, which argued that his physical detention, search, and questioning were illegal because the tipster's call was anonymous, provided no physical features or characteristics of the person or the motorcycle, and lacked reliability or corroboration (no effort was made to contact the caller). Neither the caller nor the officers observed any behavior that could form the basis for a well-founded and reasonable suspicion that Weakley had or was about to commit a crime. The trial court denied the motion, a ruling that on appeal presents a mixed question of fact and law: the former receives deference while the latter requires the independent application of the constitutional standard (i.e., de novo review). *Ornelas v. United States*, 517 U.S. 690, 699 (1996) (holding that "as a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal."); *Majors v. State*, 70 So. 3d 655, 659 (Fla. 1st DCA 2011) ("A trial court's factual findings supporting a motion to suppress are reviewed to determine whether they are grounded in competent, substantial evidence, and its legal conclusions are reviewed de novo. . . . whether reasonable suspicion exists for a detention under a specific set of facts is a question of law to be reviewed de novo.").

The Fourth Amendment and its Florida counterpart establish the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" absent a warrant or a judicially-recognized exception. U.S. Const. amend. IV; FLA. CONST. art. I, §12 (requiring that this "right shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court."). No dispute exists that Weakley was seized without a warrant, leaving only the question of whether the State met its burden to establish that the "investigatory detention" exception applies in this case. *Florida v. Royer*, 460 U.S. 491, 500 (1983) ("It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.")

In accord with Supreme Court precedent, our supreme court has held that "a police officer may reasonably detain a citizen temporarily if the officer has a reasonable suspicion that a person has committed, is committing, or is about to commit a crime." *See Popple v. State*, 626 So. 2d 185, 186 (Fla. 1993) (citing *Terry v. Ohio,* 392 U.S. 1 (1968) (holding that reasonable suspicion requires more than a "hunch" about possible criminal activity)). To avoid a Fourth Amendment violation, "an investigatory stop requires a well-founded, articulable suspicion of criminal activity. Mere suspicion is not enough to support a stop." *Popple*, 626 So. 2d at 186; *see also* § 901.151 Fla. Stat. (1991).

> To justify an investigative detention, a law enforcement officer must have *a reasonable suspicion that a person has committed or is about to commit a **crime**. . . .* A hunch or a mere suspicion is not enough. As the Florida courts have explained, the officer must be able to articulate the supporting facts, and the suspicion must be well-founded.

*Faunce v. State,* 884 So. 2d 504, 506 (Fla. 1st DCA 2004) (emphases added). The quantity and quality of information are key in assessing reasonable suspicion, which "is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the 'totality of the circumstances—the whole picture,' . . . that

8

must be taken into account when evaluating whether there is reasonable suspicion." *Alabama v. White*, 496 U.S. 325, 330 (1990) (quoting *United States v. Cortez,* 449 U.S. 411, 417 (1981)); *see also Illinois v. Gates*, 462 U.S. 213, 238 (1983) (reaffirming the use of "the totality-of-the-circumstances analysis that traditionally has informed probable cause determinations.").

The two-step process for assessing the constitutionality of an investigatory stop requires, first, the identification of the "historical facts" leading up to the search and, second, whether these facts, "viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion" of criminal activity to justify a stop. *Ornelas*, 517 U.S. at 696. The second step—application of an objective standard—presents a "mixed question of law and fact." *Id.* Reasonableness "is measured in objective terms by examining the totality of the circumstances," *Ohio v. Robinette*, 519 U.S. 33, 39 (1996), with the subjective intentions of the officers playing no role, *Whren v. United States*, 517 U.S. 806, 813 (1996).

The dispositive issue is whether the limited information the officers had from the anonymous call plus Weakley's conduct meets the constitutional standard for an investigatory detention, i.e., whether the detaining officers had a well-founded and reasonable suspicion that the approaching motorcyclist had committed or was about to commit a crime that justified his immediate detention. Put another way, what crime did the officers reasonably believe the oncoming motorcyclist had committed to justify immediate detention? The unverified anonymous tip and motorcyclist's conduct viewed collectively and objectively fail to show a well-founded basis to reasonably suspect that the motorcyclist had committed a crime for which immediate investigatory detention was permissible.

Unlike cases involving reliable and detailed information from known tipsters buttressed by police observations that corroborate or independently observe potential criminal conduct, the totality of the evidence in this case is skimpy: a bare-bones anonymous tip plus the perceived flight of an approaching motorcyclist. To begin, an anonymous tip must be closely scrutinized for reliability because "[u]nlike a tip from a known informant whose reputation

9

can be assessed and who can be held responsible if her allegations turn out to be fabricated, . . . 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity[.]'" *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (citation omitted). Unlike information from reliable and verifiable third parties, upon which officers can rely, an anonymous tip falls at the lower spectrum of reliability and is accorded little to no weight. *Baptiste v. State*, 995 So. 2d 285, 292 (Fla. 2008) ("a truly anonymous tip has been consistently held to fall on the low end of the reliability scale, primarily because the veracity and reliability of the tipster is unknown.").

The anonymous call here is at the bottom of the reliability index. The caller refused to be identified and, indeed, was never contacted, remaining unknown and nameless today. The information provided was generic and overly vague. No description was given of the person or the motorcycle, no crime or illegal activity was observed (or ultimately discovered), and the anonymous caller expressed only a hunch that something suspicious may be afoot.

The record does not include audio or a transcript of the anonymous call, but it was essentially no more informative than the following hypothetical call:

> *Anonymous Caller*: Someone just drove a motorcycle up to my neighbor's home. They're on vacation.
>
> *Police Operator*: Can you describe the motorcycle or its driver?
>
> *Anonymous Caller*: No.
>
> *Police Operator*: Did you see any criminal activity?
>
> *Anonymous Caller*: No, but I'm concerned about a burglary or something.
>
> *Police Operator*: Thank you.

10

Anonymous calls of this type lack meaningful details for police officers to corroborate as to the vehicle, its driver, or suspected criminal activity. It provides nothing more than a highly speculative hunch, and nothing reliable upon which to conclude, that a crime was in progress or about to occur, let alone that the motorcyclist was the perpetrator. As the Supreme Court stated in its unanimous opinion in *J.L.*:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. *The reasonable suspicion here at issue requires that a tip be reliable in its assertion of **illegality**, not just in its tendency to identify a determinate person.* Cf. 4 W. LaFave, Search and Seizure § 9.4(h), p. 213 (3d ed.1996) (distinguishing reliability as to identification, which is often important in other criminal law contexts, from reliability as to the likelihood of criminal activity, which is central in anonymous-tip cases).

529 U.S. at 272 (emphases added). As the accentuated language makes clear, an anonymous tip must (a) reliably identify a "determinate person" and (b) reliably provide a reasonable suspicion as to the likelihood of criminal activity.

Neither of these facets of reliability for assessing anonymous sources—reliability as to a subject's readily observable appearance and reliability as to the assertion of criminal activity—is met in this case. The former obviously is not met because the caller couldn't even say whether the subject was a man or woman and couldn't describe the motorcycle. As to the latter facet, at the time Weakley was detained, the officers "did not have knowledge of any facts relating to a specific criminal offense" to support detaining him. *Hill v. State*, 51 So. 3d 649, 651 (Fla. 1st DCA 2011). The anonymous caller didn't see illegal activity and merely fretted that a burglary might be taking place; no burglary or other criminal activity was observed and, indeed, no burglary or other criminal activity was shown to have occurred. As such, the anonymous call

11

was both quantitatively and qualitatively lacking as to specifics and reliability. *Alabama,* 496 U.S. at 330.

Because the anonymous call had a "relatively low degree of reliability," "more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *Id.* The only additional information is the officer's belief that the approaching motorcyclist may have been attempting to flee the area, which objectively doesn't move the "totality of the circumstances" needle enough to justify an immediate, split-second detention. Armed with threadbare anonymous information, the officers had nothing reliable upon which to base their immediate stop of the motorcyclist as he approached, hemming him in and stopping his movement instantly. They had no reliable information that any crime, let alone a specific crime, had occurred that justified detention. *Majors*, 70 So. 3d at 659. At best, one officer characterized Weakley's turn into the bypass area as "veering" in an "aggressive" way that made him believe Weakley might be attempting to "flee" the area. This belief is too slender a reed upon which to lower the bar to permit immediate detention under the Fourth Amendment, *see, e.g.*, *Hill*, 51 So. 3d at 651 ("reasonable suspicion of criminal activity is not established simply because a defendant leaves the scene when an officer nears."), and doesn't transform the anonymous caller's speculative and unsubstantiated surmise into a well-founded basis to believe that the motorcyclist had just committed some unspecified and unseen crime.

Plus, at the fleeting moment when the approaching motorcyclist veered into the bypass shoulder, even if to flee the area, what specific crime did the officers have a well-founded and reasonable basis to believe the motorcyclist had committed? Answer: None. As in *J.L.*, the officers had no reason to suspect the approaching motorcyclist of illegal conduct other than pure speculation based on the sketchy anonymous tip. 529 U.S. at 268 ("Apart from the tip, the officers had no reason to suspect any of the three [juveniles] of illegal conduct."). The anonymous caller saw no illegal conduct and the officers admitted that they saw no illegal conduct or traffic infractions, making it all the more attenuated to conclude that a well-founded reasonable suspicion existed that a crime had occurred. *See also Majors*, 70 So. 3d at 660

12

("officers' inability to point to facts that suggested a particular crime had occurred, was occurring, or was about to occur" weighs "against a conclusion that reasonable suspicion existed."). Presented with anonymously-provided and exceedingly-slim information, the officers had no objective basis upon which to form a well-founded, reasonable suspicion that *any* crime had occurred, let alone that the approaching motorcyclist was the culprit. Apart from the anonymous tip, the officers lacked any reason to suspect the motorcyclist of illegal conduct, making the stop unconstitutional. *See J.L.*, 529 U.S. at 268.

Importantly, nothing establishes that Weakley knew the approaching vehicle was a police car, whose blue lights had not been activated, making it pure speculation that he was fleeing from the police. Moreover, even accepting the officer's subjective belief that Weakley was attempting to flee, and that Weakley knew he was fleeing from approaching police vehicles, it was not the type of "headlong" and "unprovoked flight" from police in a high crime area that ramps up the reasonable suspicion meter. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("presence in an area of heavy narcotics trafficking" plus "unprovoked flight upon noticing the police" supported a finding of reasonable suspicion); *C.E.L. v. State*, 24 So. 3d 1181 (Fla. 2009) (investigatory detention permissible where juvenile's continued flight from officers was in a high-crime area and in defiance of a police officer's order to stop); *Majors*, 70 So. 3d at 660 ("Typically, flight from the police justifies a stop when it is unprovoked and occurs in a high-crime area."). No evidence suggests that the handful of mobile homes in rural Leon County was a "high crime" area, and 9:30 pm is not a particularly crime-suspicious time of day (versus, say, 4:00 am. like in *Cooks v. State*, 28 So. 3d 147 (Fla. 1st DCA 2010)). Motorcycles coming and going from mobile homes mid-evening are not unusual or suspicious events, at least not in Florida; turning into a small bypass area on a narrow road, even if subjectively described as "aggressive," isn't unusual or unexpected and is not an objective basis for automatically stopping a motorist where no reliable information of a crime is possessed. Veering isn't a crime or even a traffic infraction, as the officer admitted; it is exactly what would be expected of any oncoming vehicle under the circumstances. After all, the officer described the bypass as "an area where, when two vehicles met, one of them would get up on the shoulder."

13

In summary, the evidence fails to objectively establish a well-founded and reasonable suspicion that the oncoming motorcyclist, Weakley, had just committed a crime that justified his detention. His seizure was based on pure speculation without a well-founded and reasonable suspicion that *any* crime had occurred. No crime was observed by the anonymous caller or the police officers, no crime was reported, and no crime was discovered; all that existed was the unsupported speculative hunch. The majority cannot identify a well-founded factual basis for what crime was allegedly committed that would justify immediate physical detention of an approaching (or even fleeing) motorcycle; the anonymous caller's hunch was that a burglary might be afoot, but one could speculate as to almost any property crime being a possibility (arson, larceny, motor vehicle theft, vandalism, etc.), thereby demonstrating the unreasonableness of detention.[2]

No case remotely supports the majority's holding on the facts presented. That's because the benchmark applied in this case is lower than any this Court (or the United States Supreme Court or our supreme court) has applied in other similar investigatory detention cases; indeed, it falls below the benchmark set in three *citizen informant* cases (i.e., cases where information provided is deemed *more reliable* than anonymous tips) from this Court. For instance, in *Cooks*, a 4:00 am report of suspicious activity was made by a hotel clerk ("Glenda") that a black male—who was with three other black males in a maroon four-door vehicle, possibly a

---

[2] The officers couldn't conduct an investigatory detention for suspected trespass because Weakley had not been previously issued a no-trespass warning as to the property. *Moore v. State*, 200 So. 3d 1290, 1292 (Fla. 2d DCA 2016) (no legal authority to conduct an investigatory stop for trespass unless the potential trespasser has been previously warned by the property's owner or agent); *Gestewitz v. State*, 34 So. 3d 832, 834 (Fla. 4th DCA 2010) (same); *see also D.T. v. State*, 87 So. 3d 1235, 1241 (Fla. 4th DCA 2012) ("Mere presence on the property is insufficient to give rise to a reasonable suspicion of trespass and a reasonable suspicion of trespass must be based upon something more than 'a mere hunch or guess.'") (quoting *Rochell v. State,* 934 So. 2d 586, 586 (Fla. 1st DCA 2006)).

Lincoln—was trying to open the back door of the hotel. 28 So. 3d at 148. The clerk told them to leave and, fearing for her safety, called the sheriff's office. "En route to the hotel, the deputy saw a car matching the description in the [dispatch] report. The deputy turned behind it and stopped the car. [Cooks] was driving and there was one other person in the car." *Id.* Cooks was detained, drugs were found in the car and in his jacket, and his motion to suppress challenging the constitutionality of the investigatory stop was denied.

This Court reversed, concluding that although the hotel clerk, Glenda, was a "citizen informant" whose information is accorded greater reliability and weight, the detailed information she provided failed to "create a reasonable suspicion that [Cooks] (or anyone else) had committed, was committing, or would commit a crime." *Id.* at 150.

> According to the deputy's testimony, the hotel clerk told the dispatcher that a black man tried to open the back door of the Blue Angel Inn about an hour before she called, that the man left in a maroon Lincoln, and that there were a total of three black men in the car. Assuming all of this is true . . ., *it is difficult to see how this forms a reasonable suspicion that [Cooks] had committed, was committing, or would commit a crime.* Even the deputy did not know what crime had been committed; he was on his way to "ascertain" just that.

> The deputy testified that he felt there might have been a trespass or attempted burglary, but the state makes no real attempt to argue that trying the back door to a hotel and then leaving rises to the level of those crimes, and it is noteworthy that [Cooks] was not charged with any offense related to the suspicious activity reported by the hotel clerk. Even if, as the police report states, the hotel clerk was afraid that the men she saw may have been trying to see whether she was alone for purposes of robbing her, *the clerk's "hunch" about the men's intention (which apparently was not correct because the men left and no robbery occurred) was not enough to establish a reasonable suspicion that would justify the stop.*

15

*Id.* (emphasis added). Because "the tip was not reliable 'in its assertion of illegality'" the stop of Cooks was impermissible. Unlike the anonymous caller in this case, the hotel clerk in *Cooks* was a "citizen informant" who "falls at the higher end of the reliability scale." *Baptiste,* 995 So.2d at 291. Even with a higher level of reliability and far greater detail about the suspicious conduct in *Cooks*, this Court found no "reasonable suspicion that [Cooks] (or anyone else) had committed, was committing, or would commit a crime." *Cooks,* 28 So. 3d at 150.

Similarly, in *R.E. v. State,* 536 So. 2d 1125 (Fla. 1st DCA 1988), a citizen informant, Harold Davis, made calls to the sheriff's department after observing what he believed might be drug transactions.

> Mr. Davis reported that he had been in a parking lot in Williston when he observed a meeting between two persons in a late model white automobile and other persons in a blue Pontiac. What appeared to be a key case passed between the cars and the occupants of the blue car opened the trunk of the white car. Although Mr. Davis did not see drugs or money change hands, the behavior of the participants suggested to him that a drug transaction had taken place. Mr. Davis identified the participants as white males and provided a partial license plate number for the white car.

*Id.* at 1126. After receiving another call from Davis, a message was sent to "be on lookout for a white Pontiac, tag number CEB–9?U, whose driver might be selling drugs," after which an officer soon saw and stopped a vehicle matching the description (with tag number CEB–92U) even though "there was nothing to arouse suspicion and the driver was obeying the traffic laws" at the time. *Id.* Amongst the three juveniles in the car were "several cans of beer" and marijuana. *Id.* at 1127.

In concluding that the investigatory detention was improper, this Court made two points. First, it rejected the view that the information provided by the informant "pertained to a specific offense," concluding instead that the report was of "generalized,

allegedly suspicious activity" and that "it is necessary to make the additional showing that the information made it reasonable to suspect that a crime had been, was being, or would be committed." *Id.* at 1128. Second, a "citizen's claim of suspicious activity that has a minimal objective basis" must be corroborated by more than the "innocent details of identification (e.g., a license plate number)" to make the "required showing that the information was sufficiently detailed to single out the suspect." *Id.* Such information, however, does not "create or support a suspicion that crime is afoot, which is essential if a report of generalized, allegedly suspicious activity is to justify a stop." *Id.*; *see also N.S. v. State*, 227 So. 3d 132 (Fla. 4th DCA 2017) (detective responding at 9:00 pm to a call of a suspicious vehicle at apartments detained a juvenile who was walking away as he approached; held, an unconstitutional investigatory detention); *Collins v. State*, 115 So. 3d 1040, 1042, 1043 (Fla. 4th DCA 2013) ("anonymous tip that two juveniles were loitering around the complex and that narcotics were possibly involved," but providing "no race, no gender, no other description" was "bare bones" and not "sufficient, even if corroborated, to justify an investigatory stop."). Applied here, it is obvious that the anonymous call—which gave far less information than the citizen informant in *R.E.*—pertained to no specific offense and amounted to a generalized and nonactionable suspicion that lacked an objective basis for detention.

Additionally, in *Majors*, a "bank manager called 911 and, whispering, reported that a customer was 'acting weird' and attempting to withdraw $17,500." 70 So. 3d at 658. The customer, who'd not made large withdrawals before, "wanted to make a check payable to the driver of a Nissan that was parked in front of the bank, and the customer kept going back and forth between the Nissan and the bank, acting strangely and having discussions with the people in the Nissan." *Id.* The bank manager said, "the customer seemed to know what he was doing but that the bank employees thought he might be on drugs." *Id.* Officers arrived at the bank and used their vehicles to block the Nissan, which was attempting to back out of a parking space, arresting Majors in the process. *Id.*

In concluding that the investigatory stop was unjustified, this Court made two critical points that are dispositive here. First, it

17

noted that the officers admitted "that they did not suspect any particular crime was occurring when they stopped the Nissan," *id.* at 660, which weighs against the requirement that they "must be able to articulate in particular and objective terms his reasonable suspicion of criminal activity," *id.* (quoting *Palmer v. State,* 625 So. 2d 1303, 1306 (Fla. 1st DCA 1993)).

> Importantly, *the officers in this case were not able to articulate a basis for suspecting criminal activity, as they were not even able to state a crime they believed was occurring.* As suggested above, this factor weighs heavily in favor of a conclusion that no reasonable suspicion existed. *Moreover, had they named a crime they believed was occurring, there would have been insufficient evidence to support their suspicion.* The customer's activity inside the bank was strange, but the concern that this strange behavior and his interaction with the Nissan related to criminal conduct was not supported by any articulable facts.

*Majors*, 70 So. 3d at 661 (emphasis added). Like those in *Majors,* the officers here failed to articulate any particular crime for which a well-founded and reasonable suspicion existed to stop Weakley. And, most importantly, even if the officers had "named a crime they believed was occurring," the anonymous tip in this case contained no information upon which to conclude that a well-founded and reasonable suspicion of criminal activity existed.

Second, the Court in *Majors* concluded that the "Nissan's attempt to leave the bank when the officers arrived does not tip the scale in favor of finding reasonable suspicion because the testimony indicates that the Nissan simply began to back out of a parking space." *Id.* Like the Nissan in *Majors*, the motorcyclist's turn into the bypass area, even if subjectively believed to be flight, does not tip the scales under the circumstances. The Court rejected the State's argument that "the Nissan's attempt to leave the bank supports a conclusion that the officers had reasonable suspicion." *Id.* at 660. Though agreeing that flight can be a factor, particularly headlong flight from police in a high-crime area, it emphasized that "'reasonable suspicion of criminal activity is not established simply because a defendant leaves the scene when an officer

18

nears.'" *Id.* (citation omitted). In considering "all of the circumstances" in *Majors*, this Court held that "any suspicion that the people in the Nissan were . . . involved in a crime is highly speculative and properly characterized as a hunch." *Id.* at 661. Measured against the facts, legal principles, and holding in *Majors*, the outcome in this anonymous tip case ought to be a reversal.

The majority is critical of my view, citing to *District of Columbia v. Wesby*, 138 S. Ct. 577 (2018) and *United States v. Arvizu*, 534 U.S. 266 (2002), which—upon inspection—demonstrates how far afield their legal analysis strays. *Wesby* involved whether the totality of the circumstances established probable cause to arrest a partygoer for unlawful entry at a vacant, unfurnished, squalid, and beer can-ridden home where loud music, marijuana smoke, strippers, men with a naked woman on a bare mattress, and other obvious indicia of illicit revelry were "going strong when the officers arrived after 1 a.m.," supporting the conclusion that attendees "knew their party was not authorized." 138 S. Ct. at 586–87. Under these extreme circumstances, the officers could reasonably infer "that the partygoers knew their party was not authorized" because "most homeowners do not invite people over to use their living room as a strip club, to have sex in their bedroom, to smoke marijuana inside, and to leave their floors filthy." *Id.* at 587. But these circumstances aren't remotely similar to the anonymous tip/veering in this case. And Weakley—unlike the partygoers in *Wesby* who scattered and hid when police arrived—didn't engage in unprovoked flight at the "first sign of police." *Id.* at 589. Indeed, no evidence exists that he knew a police car was approaching that evening until he was hemmed in and detained (at which point blue lights were first turned on).

In *Arvizu*, a border patrol agent intercepted, followed, obtained the tag and registration of, ultimately stopped, and then conducted an investigatory detention of a minivan that drove along a largely unpaved backroads route "very rarely traveled except for use by local ranchers and forest service personnel," but often used by drug smugglers and those illegally immigrating to avoid the border checkpoint. 534 U.S. at 269. The route is populated with sensors to detect traffic trying to evade the checkpoint and gain access from Mexico to the cities of Tucson and Phoenix. Two

sensors were triggered during a checkpoint shift change, which the agent knew was when smugglers, who did extensive scouting of their own, would most likely use the route. *Id.* at 269-70. The agent drove to the area and saw a minivan (of the "type" the agent "knew smugglers used") driven by a man with a woman and three small kids. *Id.* at 270. The "driver appeared stiff and his posture very rigid" and "seemed to be trying to pretend that [the agent] was not there," which was odd because "in that area most drivers give border patrol agents a friendly wave." *Id.* Two of the "children sitting in the very back seat were unusually high, as if their feet were propped up on some cargo on the floor." *Id.*

The agent followed the minivan, whose passengers included three children who "though still facing forward, put their hands up at the same time and began to wave at [the agent] in an abnormal pattern. It looked to [the agent] as if the children were being instructed. Their odd waving continued on and off for about four to five minutes." *Id.* at 270–71 (internal citation omitted). After the van made some unusual signals, it turned onto a rough road (primarily suitable for four-wheel drive vehicles) that lacked a picnic area (the agent had never seen anyone picnicking or sightseeing in the area). *Id.* at 271. The agent decided to check the minivan's registration, learning that it was registered to an address "that was four blocks north of the border in an area notorious for alien and narcotics smuggling." *Id.* At that point, the agent pulled over the minivan, asked the driver if he could inspect the interior (the driver consented), and found "marijuana in a black duffel bag under the feet of the two children in the back seat" and "[a]nother bag containing marijuana was behind the rear seat." *Id.* at 272. On these facts, the Supreme Court reversed the Ninth Circuit, which had used a ten-factor test that isolated and independently evaluated each factor without consideration of their totality.

Unlike this case, *Arvizu* did not involve an anonymous tip, was based on reliable evidence of at least *ten* potential factors relevant to ongoing drug trafficking at the U.S.-Mexico border, and involved the specialized experience and direct observations of a border agent who followed and watched the suspicious minivan and its oddly-acting occupants for many miles before deciding to conduct a stop after a check of the vehicle's registration placed it

in a "notorious" drug neighborhood. The quantity and quality of evidence supporting reasonable suspicion for an investigatory stop in *Arvizu* fully eclipses the scanty, unreliable information here. It took the Ninth Circuit, which engaged in a "sort of divide-and-conquer analysis" and hyper-critical parsing of the ten factors, to find a lack of reasonable suspicion. *Id.* at 274. In sharp contrast, it doesn't take that type of hyper-critical parsing of the two factors here (a vague/uncorroborated anonymous tip and Weakley's veering) to conclude that an investigatory stop was unwarranted. *Arvizu* does show, however, the value of observing a vehicle and checking its registration *before* conducting a stop, which did not occur here (the officers immediately detained and hemmed in Weakley).

Finally, and importantly, the appropriateness of police officers undertaking steps to investigate the anonymous tip in this case is not in dispute. They had broad investigative leeway in doing so without precipitously seizing Weakley as they approached the neighborhood. For example, they could have attempted to ask him questions (a citizen's encounter), follow him, or get his tag number.[3] As the Supreme Court said in *Royer*:

---

[3] For example, the arresting officer testified that had Weakley not stopped he "would have got behind [the motorcycle] and got the tag" and also attempted "to make contact." On direct examination by the State, he testified as follows:

> Q: If this had been a two-lane road and [Weakley] could have just continued to go past you, would you have -- what would your actions have been, if he had – if he had continued past you and not tried to veer off anywhere.

> A: Either myself or I would have directed Deputy Matthews to turn around and get behind the vehicle, get a tag, try to identify who was on it . . . we would have got behind that vehicle and got the tag and -- and, you know, tried to make contact.

(Emphasis added). The focus of the question is what would have happened if Weakley had been able to continue past the officers; the question neither presumed nor established that the officers

> . . . law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.

460 U.S. at 497. Even if Weakley refused to cooperate and departed, that wouldn't foreclose efforts to track him and get the motorcycle's license plate. But immediate detention or seizure was impermissible. *See Florida v. Bostick*, 501 U.S. 429, 437 (1991) ("We have consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."); *see also Royer*, 460 U.S. at 497–98 ("The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. . . . He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds.").

Under the majority's holding, what's the point of undertaking more modest and incremental investigative techniques if officers can now simply precipitously stop, physically restrain, and question persons in situations such as this one, where an unverified and paltry anonymous tip is received? At the margin, officers in reliance on this case have greater leeway to detain people despite the obvious potential for anonymous tips of this type to "be used as a tool of harassment—a situation condemned by the Supreme Court in *J.L.*" *Baptiste*, 995 So. 2d at 298 (noting that "all a tipster would need to do is inform police that an individual had exhibited a firearm in public—rather than possessed a firearm—and that person would be subjected to gunpoint seizure and an embarrassing public search by the police.").

---

would have been unable to turn around and follow Weakley. At best, the roadway was narrow and described as "one-way access or egress," which wouldn't necessarily preclude a police vehicle from making a U-turn to pursue Weakley had he rode away (i.e., fled).

> For example, a resident who does not wish to see other persons in his or her neighborhood hypothetically could telephone a false tip that a person having a particular description had publicly displayed a firearm. *Analogously, a man or woman who seeks revenge against and to harass an ex-girlfriend or ex-boyfriend could telephone a tip alleging that she or he had brandished a firearm in public.*

*Id.* (emphasis added). The majority's holding breathes new life into anonymous tips as tools of harassment. If an anonymous caller wants a person to be detained, all she "would need to do is inform police that an individual [was near a vacant building]," fret about a possible burglary, and that person would be subjected to seizure based solely on perceived flight; the caller wouldn't even have to mention that a weapon was displayed or brandished.

\* \* \*

I cannot conclude, as the majority does, that the generic and unreliable anonymous call in this case plus Weakley's perceived flight met the requirements under the totality of the circumstances to justify an immediate investigatory detention. The record falls short of objectively establishing that a well-founded and reasonable suspicion existed that a crime was committed for which immediate detention of Weakley was permissible. At best, only a hunch or mere suspicion existed, which justified an investigation, but not Weakley's precipitous detention. Today's decision chips away a part of the Fourth Amendment's protection against "unreasonable searches and seizures" and undermines the constitutionally-protected liberty of all persons detained unjustifiably in the future based upon its holding.

_____

Andy Thomas, Public Defender, Steven Seliger, Assistant Public Defender, Lori A. Willner, Assistant Public Defender, and Aimee Lim, Assistant Public Defender, Tallahassee, for Appellant.

Ashley Moody, Attorney General, and Jason W. Rodriguez, Assistant Attorney General, Tallahassee, for Appellee.